Filed 4/20/17 (unmodified opn. attached)
## CERTIFIED FOR PARTIAL PUBLICATION[*]

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARCOS MENDOZA et al.,<br><br>    Defendants and Appellants. | H039705<br>(Santa Clara County<br>Super. Ct. Nos. 212506, C1114503)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on March 30, 2017, be modified as follows:

1. On pages 77 through 79, the three paragraphs beginning with the final paragraph on page 77 are deleted and the following two paragraphs are inserted in their place:

Because the text of the initiative is arguably ambiguous, we look to the ballot materials to determine whether they shed light on the voters' intent. (*Arroyo*, *supra*, 62 Cal.4th at p. 593.) Ramirez points to several statements from the argument in favor of Proposition 57 that he argues suggest the voters intended to apply Proposition 57 retroactively: "Prop. 57 focuses resources on keeping dangerous criminals behind bars, while rehabilitating juvenile and adult inmates and saving tens of millions of taxpayer dollars"; "Prop. 57 focuses our system on evidence-based rehabilitation for juveniles and adults because it is better for public safety than our current system"; "Prop. 57 saves tens

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, the opinion remains certified for publication with the exception of part II.

of millions of taxpayer dollars by reducing wasteful prison spending, breaks the cycle of crime by rehabilitating deserving juvenile and adult inmates, and keeps dangerous criminals behind bars"; "Requires judges instead of prosecutors to decide whether minors should be prosecuted as adults, emphasizing rehabilitation for minors in the juvenile system"; and "Evidence shows that the more inmates are rehabilitated, the less likely they are to re-offend. Further evidence shows that minors who remain under juvenile court supervision are less likely to commit new crimes. Prop. 57 focuses on evidence-based rehabilitation and allows a juvenile court judge to decide whether or not a minor should be prosecuted as an adult." (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) argument in favor of Proposition 57 and rebuttal to argument against Proposition 57, pp. 58–59.)

Though the foregoing passages express voter intent to focus on rehabilitation, they are silent as to intent regarding retroactivity. And, like the statement of intent from Proposition 57 we have already discussed, the last two of those passages are susceptible of the same inference of *prospective* intent. Both state that judges should decide whether minors "should be prosecuted," suggesting an intent that the law apply only to future prosecutions.

2. On page 90, the following is added as footnote 33 after the final sentence of Part III.E:

Ramirez also argues that, even if his constitutional arguments fail, Proposition 57 should be construed as retroactive to avoid serious and doubtful constitutional questions. "If a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable. [Citations.] The basis of this rule is the presumption that the

2

Legislature intended, not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers." (*Miller v. Municipal Court* (1943) 22 Cal.2d 818, 828.) This rule of statutory construction is inapplicable here. Construing Proposition 57 as prospective-only does not raise "serious and doubtful" constitutional issues, as our analysis of those constitutional issues demonstrates. Hence, no presumption arises that the voters intended to avoid these issues.

There is no change in the judgment.

The petitions for rehearing are denied.

_____
BAMATTRE-MANOUKIAN, Acting P.J.

_____
MIHARA, J.

_____
GROVER, J.

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARCOS MENDOZA et al.,<br><br>    Defendants and Appellants. | H039705<br>(Santa Clara County<br> Super. Ct. Nos. 212506, C1114503) |

Maurillo Garcia died in August 2011 after receiving multiple stab wounds. Defendants Marcos Mendoza, David Martell, and Juan Javier Ramirez (collectively, defendants) appeal their convictions, following a joint trial, for second degree murder (Pen. Code, §§ 187, 189)[1] with gang enhancements (§ 186.22, subd. (b)) for killing Garcia.

On appeal, defendants briefed the case separately but many of their arguments overlap. All defendants argue the trial court erred by: (1) excluding statements of Javier Barragan, a co-perpetrator; (2) allowing the prosecutor to commit misconduct during the opening statement; (3) admitting unduly prejudicial evidence of gang-related intimidation; and (4) failing to properly instruct the jury regarding (a) voluntary intoxication, (b) the required mental state for guilt as an aider and abettor, and (c) the evidence necessary to prove the gang enhancement. All defendants argue that the prosecution presented insufficient evidence to support their gang enhancements.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.

[1] Unspecified statutory references are to the Penal Code.

Mendoza and Ramirez argue that the trial court erred by: (1) allowing the prosecution to commit misconduct during its examination of John Deleone, a witness for the prosecution; (2) admitting unduly prejudicial out-of-court statements by Mendoza and Ramirez; (3) admitting unduly prejudicial evidence of prior convictions to prove a " 'pattern of criminal gang activity' " (§ 186.22, subd. (e)); and (4) allowing the gang expert to show unduly prejudicial slides in the slideshow that accompanied his expert testimony.

Mendoza argues that the prosecution provided insufficient evidence to corroborate accomplice Tommy Gonzalez's testimony about Mendoza's involvement in the homicide.

Martell argues that the prosecution presented insufficient evidence to support his guilt and contends that his trial counsel provided ineffective assistance by failing to present a plausible theory of Martell's innocence and by failing to properly cross-examine a witness.

All defendants argue the foregoing errors were cumulatively prejudicial.

In our original unpublished opinion, we found no prejudicial error, modified the judgments to specify a 15-year minimum parole eligibility (§ 186.22, subd. (b)(5)), and affirmed the judgments as modified.[2]

All defendants petitioned for rehearing. Ramirez argues, among other things, that Proposition 57, the Public Safety and Rehabilitation Act of 2016, should be applied retroactively to his case because he was 16 years old at the time of the offense and his judgment was not final when voters approved Proposition 57 at the November 2016 general election. We granted rehearing to determine whether Ramirez was entitled to relief under Proposition 57.

---

[2] The same day we filed the original opinion, we denied a petition for writ of habeas corpus filed by Martell's appellate counsel that alleged ineffective assistance of trial counsel. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

In the published portion of this opinion, we conclude that Proposition 57 does not apply retroactively to Ramirez's case. In the unpublished portion (part II), we adhere to our original analysis and again find no prejudicial error, however we will direct that a new abstract of judgment be prepared for each defendant to note a 15-year minimum parole eligibility date based on Penal Code section 186.22, subdivision (b)(5).

## I.    TRIAL COURT PROCEEDINGS

### A. THE HOMICIDE

The jury heard two accounts of Maurillo Garcia's death. Tommy Gonzalez, an accomplice, provided one account. Tommy testified that he was drinking with fellow Norteño gang members in the front yard of his house when a suspected Sureño gang member started spray-painting on the street by the house, leading Tommy and several others to chase down and assault the Sureño.[3] Salvador Rivas, an eyewitness, provided a second account. He testified that he was at a party at his father's house when he saw a group of five to seven men run toward and assault a man who was spray-painting in the street.

### 1.  Co-Perpetrator Tommy Gonzalez's Account

Tommy Gonzalez testified for the prosecution as part of a plea agreement whereby the prosecutor agreed to reduce his murder charge related to Maurillo Garcia's death to voluntary manslaughter in return for his truthful testimony at defendants' trial. Tommy lived at 436 Ezie St. with his mother, his brother Raymond Gonzalez, Jr. (Raymond Jr.), his nephew Raymond Gonzalez III (Raymond III), and others. Tommy had been a Norteño gang member since he was nine years old. His nickname was Beast because he fought frequently when he was incarcerated for a juvenile offense.

Tommy's friend Javier Barragan called him in the afternoon on August 27, 2011 and asked if he could come "kick back" at Tommy's house. Barragan arrived around

---

[3]  Meaning no disrespect, we refer to members of the Gonzalez family by their first names because multiple members of the Gonzalez family were involved in this case.

6:00 or 7:00 p.m. with defendants Mendoza and Ramirez. Tommy knew Mendoza by the nickname Travieso and Ramirez by the nickname Smiley. Tommy testified that Barragan, Mendoza, and Ramirez were all part of a Norteño subset called San Jose Unidos. They all drank beers in the front yard and were eventually joined around 8:00 p.m. by defendant Martell, known to Tommy as Guerro. Tommy had not met Martell before, but Barragan assured him that Martell was " 'good people.' " At trial, Tommy identified all three defendants as the people who came to his house on August 27.

Around 10:00 p.m., Tommy saw a person (later identified as Maurillo Garcia) who looked like a Sureño gang member walk past the house twice within two minutes. Garcia walked to a stop sign where Richdale Avenue dead-ends into Ezie Street and spray-painted something on the ground while saying "Sur Trece Putos Calle." Tommy perceived Garcia's actions as a challenge. Tommy ran toward Garcia, followed closely by Martell and then more distantly by Mendoza, Ramirez, and Barragan. Tommy swung at Garcia but missed; Garcia cut Tommy's stomach with a screwdriver. Tommy backed up and "everybody jump[ed] on" Garcia. Mendoza and Ramirez were punching Garcia. Tommy did not see Martell or Barragan do any punching or kicking. Tommy and the others ran back to his mother's Cadillac that was parked in front of 436 Ezie St. and drove away.

### 2. Witness Salvador Rivas's Account

Salvador Rivas testified that on the night of the homicide he was attending a party at his father's house on Ezie Street, which faces the intersection of Richdale Avenue and Ezie Street. Rivas was in the garage and the garage door facing the street was open. Jose Garcia (Maurillo Garcia's brother, whom we refer to as Jose for clarity) walked by the house and Rivas's father invited Jose to have a beer. Rivas noticed Maurillo Garcia spray-painting on the street near a stop sign. Five to seven men came from the direction

4

of 436 Ezie St. and chased Garcia.[4]  Rivas heard someone yell " 'Get him' " and " 'Norte.' "

Rivas testified that Garcia ran but was tripped and fell, at which point all of the men who chased him started beating him.  Rivas stated that everyone participated in the assault.  Garcia managed to get up for a moment but the men knocked him down again and continued to beat him.  Rivas testified that the men mostly kicked Garcia but some punches were also thrown.  He could not clearly see any weapons.  He saw something shiny but acknowledged it could have been a belt buckle.  Rivas also could not see any of the attackers well enough to identify them in court.  The attack lasted about 30 seconds.  The men went back toward 436 Ezie St. and left in a Cadillac.  One of the men might have left separately in a van.

Rivas described the assailants as Hispanic males between 20 and 30 years old.  He acknowledged that it was not very light outside the night of the homicide, that there were no streetlights in the area of Richdale where the homicide took place, and that there were some cars and trucks parked in the driveway of his father's house.  He estimated his vantage point in the garage was 60 yards from the victim.

## B. DEFENDANTS CHARGED WITH MURDER

Defendants were each charged in a single felony information with murder (§ 187), with a special allegation that each committed the murder for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)).[5] Ramirez, who was 16 on August 27, 2011, was charged as an adult.  (Former Welf. &

---

[4]  As relevant to one of Martell's appellate arguments, Rivas's testimony at trial regarding the chase was somewhat inconsistent.  On direct examination, Rivas testified that one male led the chase and was followed by the remaining people.  On cross-examination, Rivas testified that two men led the chase but that one of them was slightly in front of the second, with the rest further behind the second man.

[5]  Ramirez and Martell were held to answer following a joint preliminary hearing. Mendoza was indicted by a grand jury.  Defendants' cases were eventually consolidated.

5

Inst. Code, § 707, subds. (b), (d)(1); Stats. 2008, ch. 179, § 236, pp. 653–656.) The information alleged that Martell had a prior juvenile adjudication that qualified as a strike. (§ 667, subds. (b)–(i); Former Welf. & Inst. Code, § 707, subd. (b); Stats. 2008, ch. 179, § 236, pp. 653–656.)

## C. TRIAL

Trial commenced in February 2013. Defendants moved for a mistrial after the prosecutor's opening statement, alleging that he argued facts that would not be introduced into evidence, vouched for prosecution witnesses, denigrated defendants, and committed *Griffin* error through improper reference to Ramirez's silence when interrogated after his arrest. (*Griffin v. California* (1965) 380 U.S. 609 (*Griffin*).) The court denied the motion.

### 1. Additional Testimony About the Homicide

Raymond Gonzalez, Jr. testified that Barragan, Martell, and Ramirez were drinking with Tommy in the front yard of 436 Ezie St. on the evening of the homicide. When the prosecutor pointed to Mendoza in the courtroom and asked if he was also there, Raymond Jr. responded, "I think so." Tommy dropped Raymond Jr. off at a clubhouse in San Jose around 7:00 or 8:00 p.m. on August 27 and Raymond Jr. did not return home until after 2:00 a.m. On cross-examination, Raymond Jr. acknowledged that he was a Norteño when he was younger but said he "grew up out of it." He also acknowledged that the district attorney's office had paid to relocate his family in return for his cooperation and that he had never told the police that Tommy was at the house on the night of the homicide.

Raymond Jr.'s son, Raymond III, also testified. Raymond III testified that he stayed inside the house at 436 Ezie St. the whole night on August 27. Raymond III was on juvenile probation when the homicide occurred. He did not want to testify. He denied that any of the defendants were at 436 Ezie St. the night of the homicide. He claimed that he lied to the police over the course of several interviews, telling them multiple versions

6

of what happened that night and providing fictitious descriptions of suspects. He acknowledged testifying at Martell and Ramirez's preliminary hearing that five men came over to the house the night of the homicide, that he had seen those men before, and that they eventually left in his grandmother's Cadillac. He denied that his uncle Tommy was at the house the night of the homicide, and said his father Raymond Jr. had been there but had left at some point.

San Jose Police Detective Merlin Newton testified about Raymond III's statements to him in the early morning the night of the homicide and during subsequent interviews. The night of the homicide, Raymond III described three suspects to Newton: a man with the nickname Big Tone; a man with "S.J." tattooed on his chest; and a 16-year-old. Newton testified that Raymond III made different statements at different interviews but that at some point he told Newton that he had been in the front yard of the house the night of the homicide and saw five Norteño men run after a person who was spray-painting on Richdale Avenue. Raymond III reportedly told Newton that the men ran out of Raymond III's view and eventually returned to the house before driving away in his grandmother's Cadillac.

Newton testified that, over the course of four interviews, Newton showed Raymond III pictures of individuals (including the defendants) and asked Raymond III if any of them were at the house the night of the homicide. Raymond III was inconsistent regarding whether Martell had been there the night of the homicide but at some point he identified a picture of Martell as a suspect during one of the interviews. Raymond III identified a picture of Ramirez as the 16-year-old he had described as being present the night of the homicide. He also identified pictures of three people who were never charged. Raymond III never identified pictures of Tommy or Mendoza.

7

## 2. Defendants' Flight the Night of the Homicide

### a. Tommy's Testimony

Tommy testified that he drove the Cadillac away from 436 Ezie St. with Mendoza, Ramirez, Martell, and Barragan. While they were driving, Mendoza reportedly stated, " 'I got that nigga,' " and also stated that he " 'booked him' " 14 or 15 times. Ramirez said "I was carving that fool's face," and then complained to Mendoza that "you fucking cut me, bitch." Mendoza responded that Ramirez "shouldn't be getting in my way when I'm handling my business." Ramirez had a deep cut on his hand.

Tommy testified that Barragan told him to drive to Peckerwood's (later identified as John Deleone's) apartment in the Thornbridge Apartments, which were near Ezie Street. Barragan asked for the weapons and Tommy reportedly saw a kitchen knife that had been used by Mendoza as well as a screwdriver.[6] At some point, Martell said that he had dropped his phone somewhere. Tommy parked, they wiped down the car, and he and Barragan went upstairs to Deleone's apartment. Tommy or Barragan handed the weapons to Deleone, Deleone's girlfriend took them into the bathroom, and then "you hear the water running."

Tommy testified that Barragan's brother Junior picked the group up from Deleone's apartment about ten minutes after they arrived and drove them to Barragan's mother's house near the Oakridge Mall. The group stayed at Barragan's mother's house for a short time. Martell left separately before the others. Tommy, Barragan, Mendoza, and Ramirez were picked up by someone with the nickname Creeper and driven to Milpitas. When they arrived in Milpitas, a "cop car pulled in right behind us, and we got off and took off running."

---

[6] Tommy acknowledged on cross-examination that he had told the police during previous interviews that he never saw the weapons.

### b. John Deleone's Testimony

John Deleone testified in return for use immunity and an agreement that the prosecutor would resolve pending drug charges against Deleone with drug rehabilitation and a county jail sentence. Deleone testified that in August 2011 he was a heavy methamphetamine user, using up to one-eighth ounce per day. His girlfriend was also a heavy methamphetamine user. He acknowledged at trial that he had a poor memory due to his prior drug use. He knew Barragan and also knew Mendoza, but only by the nickname Travi. He knew Ramirez by the nickname Smiley and claimed to be like a big brother to him. Based on refreshed recollection from Deleone's testimony at Mendoza's grand jury proceedings, Deleone testified that Barragan was a Norteño who was affiliated with San Jose Unidos. Deleone acknowledged that he identified Ramirez at the grand jury hearing as a member of San Jose Unidos but testified at trial that "I might have misspoke when you asked me that question."

Deleone testified that Barragan and Smiley came to his apartment on August 27 around 11:00 p.m. with a third person whose identity Deleone could not remember. The prosecutor purported to refresh Deleone's recollection by reading the following out loud from the grand jury transcript: " 'What happens on this occasion? Who came over on this occasion?' [¶] Your answer was: [¶] 'I remember Javi, Javier, Juan, and somebody else. I don't remember who the other person -- I think it was Travi, but I couldn't be certain.' "[7] Deleone acknowledged at trial that he had also told investigating officers that the third person could have been Beast (Tommy's nickname). Deleone did not see Martell that night.

Deleone testified that the people who came to his apartment that night were agitated. Ramirez reportedly told Deleone that he hit a guy with a Phillips-head screwdriver five to ten times and demonstrated by making stabbing motions on a couch

---

[7] The court overruled defense objections to the prosecutor's method of refreshing Deleone's recollection.

or a pillow. When asked whether the people who came to his house brought weapons, Deleone stated that they brought a knife, a box cutter, and a Phillips-head screwdriver. The court later struck that testimony when Deleone clarified that he never saw weapons that night and instead only saw a black sweatshirt wrapped around certain items that Barragan brought to the apartment. Deleone's girlfriend took the black sweatshirt to a sink and turned on the water, at which point Deleone "could hear all the stuff rattling around in the sink."[8] Deleone testified that it seemed like the others were trying to shift the blame for the stabbing to Ramirez.

### 3. Tommy Flees, Is Arrested in Texas, and Cooperates with Police

Tommy testified that he moved to Texas after the homicide, where he was arrested in March 2012 for resisting arrest. San Jose police detectives came to Texas and interrogated Tommy regarding the Garcia homicide. Tommy testified that the officers played a short portion of a videotaped interview between Barragan and the police, during which Barragan appeared to be trying to blame everything on Tommy.[9] Faced with that interview, Tommy decided to cooperate with the police and tell them his version of the homicide.

On cross-examination, Tommy acknowledged that he had an extensive criminal history and that he cooperated with the police to avoid a possible life sentence. He also acknowledged that he might not have positively identified Martell during the initial Texas

---

[8] After the court struck the testimony about weapons, the prosecutor referred to the items in the sweatshirt as weapons two more times and the trial court sustained defense objections each time. The court later denied a defense mistrial motion based on the prosecutor's conduct.

[9] The court denied a defense motion to admit statements from the Barragan interview.

10

interview and might have stated more generally that a picture of Martell looked familiar.[10]

### 4. Cell Phone, DNA, and Fingerprint Evidence

A San Jose police officer testified that police found a cellular phone on Richdale Avenue near the intersection of Richdale and Ezie Street the night of the homicide. The phone was registered to Martell's mother and contained a photograph of Martell that looked like it was taken by Martell "holding out his cell phone and taking a photo of himself." The clip on the phone's case that would secure it to a pocket was loose.

The prosecution introduced information about the general locations of various cellular phones based on call activity on the night of the killing. San Jose Police Detective Juan Vallejo testified that cellular phone calls generally connect through the nearest cellular tower to the phone's location. The San Jose Police Department employee who created a trial exhibit mapping cellular phone activity testified that a phone's location cannot be precisely identified based on its connection with a cellular tower and that if a tower is busy a phone can connect through a different tower.

Detective Vallejo testified that on August 27, calls from Martell's phone connected through a cellular tower in the San Francisco area before 8:00 p.m. and through towers in San Jose between 8:20 p.m. and 8:23 p.m. No further calls were made from that phone after 8:23 p.m. that night. Data for a phone number associated with Tommy showed that the phone connected with a tower near the crime scene from 6:22 p.m. until 10:02 p.m., through a tower south of the crime scene and closer to Deleone's apartment at 10:41 p.m., through a tower southwest of the crime scene near Barragan's mother's house at 10:58 p.m., and through a tower in Milpitas between 2:51 and 4:03 a.m. on August 28. Data for a phone number associated with Mendoza were

---

[10] Merlin Newton, one of the San Jose detectives who interviewed Tommy in Texas, testified at trial that Tommy identified Martell during the Texas interrogation as the person who lost his phone the night of the homicide.

generally consistent with Tommy's in both time and location on August 27 and the early morning of August 28. A phone number associated with Ramirez showed phone calls made through a tower in Milpitas around the same time as some of Tommy's calls.

The jury also heard testimony regarding fingerprint and DNA evidence. A fingerprint on a beer can found in the back yard at 436 Ezie St. matched Martell. Martell's DNA was found on a cigarette located in the front yard of 436 Ezie St. A fingerprint on a different beer can found in the back yard of 436 Ezie St. matched Mendoza. One of Mendoza's fingerprints matched a fingerprint found on a beer can in the front driveway of 436 Ezie St. Mendoza's DNA was found on a swab collected from that same beer can. Ramirez's DNA was present in dried blood taken from the exterior rear passenger side door of a gray Cadillac the police found on August 31 at the Thornbridge Apartments.

### 5. Victim Information and Autopsy Results

A crime scene investigator testified that Garcia had "S.U.R." tattooed in capital letters on his left arm as well as a tattoo of a man's head wearing a bandana with "V.S.T." and "13" written on it. He also had a star to the left of his left eye and three dots to the right of his right eye.

Dr. Joseph O'Hara testified as an expert in pathology and cause of death about the autopsy he performed in the case. Garcia suffered 15 stab wounds to his face, chest, abdomen, thighs, arms, right foot, and lower back. Among the most severe stab wounds were a four- and one-half-inch deep wound to the chest; a four-inch deep wound to the abdomen that perforated his liver; a three-inch deep wound to the chest that collapsed a lung; and a five-inch deep wound to the armpit. Each of those four stab wounds could have been independently fatal without medical treatment. Though he could not be certain, Dr. O'Hara testified that the structure of the stab wounds indicated the possibility that two weapons were used: one with a single-edged blade and another with a double-edged blade. There were no round puncture wounds, as would be expected if a Phillips-

12

head screwdriver was used as a weapon. Garcia suffered three incised wounds (wounds that are longer than they are deep) and multiple blunt-force injuries, including contusions, abrasions, and lacerations. Dr. O'Hara opined that the cause of death was multiple stab wounds of the head, trunk, and extremities.

### 6. Statements by Defendants

Detective Vallejo testified about interrogating Martell on August 31 with Detective Newton.[11] Martell was read his *Miranda*[12] rights and asked about the night of the homicide. Martell claimed he had been in San Francisco watching a football game that day and returned to the San Jose area around 7:30 or 8:00 p.m. Martell claimed he was dropped off at a grocery store near Ezie Street, walked to the house of his cousin (who was not home), and then walked to his aunt's house where he stayed the rest of the night. Martell said he lost his phone that day and thought he dropped it while walking from the grocery store to his cousin's house. The prosecutor asked Vallejo whether Martell admitted being a Norteño when he was younger, and Vallejo testified that Martell "said back when he was a juvenile, he was involved with gangs." Martell repeatedly denied being on Ezie Street on August 27 and told the police he did not know anything about the homicide. Detective Vallejo testified that at the time of the interview Martell had scratches and abrasions on his hands and a large "S.J." tattooed on his stomach.

Detective Newton testified about interrogating Ramirez in September 2011 after arresting him and reading him his *Miranda* rights. Ramirez had what Newton described as a healing wound on his right ring finger. Ramirez said he was familiar with Ezie Street and had been there on one afternoon about two months earlier. He identified a picture of Barragan as a friend but claimed not to know his name. Ramirez denied being a Norteño, stating "No, I just hang out with," before trailing off. He steadfastly denied

---

[11] The video recording of the interrogation and a transcript were admitted into evidence at trial after certain information was redacted.

[12] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

13

being on Ezie Street on August 27 and also denied participating in any sort of assault that might have occurred there.

The jury heard statements made by Mendoza from three sources: a non-custodial interview; a booking interview; and text messages from Mendoza's cellular phone. Detective Newton conducted a non-custodial interview with Mendoza at Mendoza's workplace in March 2012.[13] At the non-custodial interview, Mendoza stated that he had heard of Ezie Street but had never been there. He denied being in a gang. When asked if he "claimed Northern," Mendoza responded "[j]ust Northern, yeah." Newton showed Mendoza pictures of Martell, Barragan, and possibly other suspects; Mendoza denied knowing any of them. Mendoza had a large "U" tattoo that extended from the top of his chest down to his belly button. He also had "Unidos" tattooed across his stomach. Newton testified that Mendoza told him those tattoos were in support of a college team he liked, the Utah Utes.

When Mendoza was booked into the county jail after his arrest, correctional officer Gilbert Rios conducted a classification interview with Mendoza. Rios testified that all inmates are asked if they associate with a gang when they are booked into the county jail. Inmates were told that the gang association question was for their safety and that their response would remain confidential. Rios testified that if an individual indicated they would rather be housed with members of a certain gang, that would be treated as an admission. Rios's notes indicated that Mendoza "admitted Northerner."

The trial court also admitted text messages from Mendoza's phone relating to drug sales.

### 7. Gang Expert

San Jose Police Detective Chris Gridley testified as an expert regarding gang crimes. Gridley testified about Norteños generally, described prior convictions offered to

---

[13] After minor redactions, the audio recording of Mendoza's non-custodial interview was admitted into evidence over his relevance objection.

14

prove a pattern of criminal gang activity, offered opinions about defendants' gang affiliations, and opined that the murder was gang-related. As Gridley's testimony is relevant to several issues on appeal, we will discuss it in greater detail in Part II.D.1.

### 8. Evidence of Intimidation

Evidence suggesting intimidation of witnesses was admitted over defendants' objections. Deleone testified that he was punched in the mouth by an inmate while in custody in the Santa Clara County Jail in May 2012. Deleone was told that the attack had been ordered by "the Nortenos" because Deleone had made statements to the police related to defendants' case.[14] He was "[s]omewhat" fearful for his life afterward and was moved into protective custody. Deleone asked the district attorney's office to relocate him and also asked for an escort to and from testifying at defendants' trial because he feared for his life.

Tommy testified that at some point between the homicide and his arrest in Texas, Barragan's brother Junior told Tommy that his nephew and his brother (presumably meaning Raymond Jr. and Raymond III) "are snitching on me and on everybody" and asked Tommy if he knew where they were.[15] Tommy withheld the information because he feared for both his and his family's safety.

Salvador Rivas testified that his home was vandalized in October 2011 when someone spray-painted graffiti on his garage and his car. Among the graffiti was "XIV." Rivas feared for his family's safety and believed the graffiti was related to him talking to the police because the graffiti occurred within two hours after he received a subpoena to testify in defendants' case. He remained fearful at trial.

---

[14] The hearsay statement was admitted for the limited purpose of showing Deleone's state of mind.

[15] The hearsay statement was admitted for the limited purpose of showing the effect on the listener (Tommy).

15

### 9. Defense Case

Though technically called by the prosecution, Martell's attorney sought favorable testimony from Randy Carrasco, whose grandmother was Martell's grandmother's partner. Carrasco worked with Martell as a furniture mover and testified that it was common for employees to get scratches while at work.

Defense investigator James O'Keefe testified based on a site visit that the approximate distance between where Garcia was stabbed and the garage at 452 Ezie Street was 198 feet, or 66 yards. He also testified, based on an Internet search, that there would have been almost no light from the moon on the night of the homicide.

## D. JURY INSTRUCTIONS, VERDICT, AND SENTENCING

Among other instructions, the court read versions of CALCRIM Nos. 252 (general v. specific intent), 400 (aiding/abetting generally), 401 (aiding/abetting intent), 403 (natural and probable consequences), 520 (murder), 875 (assault with a deadly weapon), 915 (simple assault), 1401 (gang enhancement) and 3426 (voluntary intoxication).

The jury deliberated for several days, and ultimately found all defendants guilty of the lesser included offense of second degree murder and found the gang allegations true. Martell waived jury on the strike allegation, which the court found true after a hearing.

The trial court sentenced each defendant to an indeterminate term of 15 years to life for murder. The court purported to stay the sentence for the gang enhancements. (See § 186.22, subd. (b)(1)(C).)[16] The court granted Martell's *Romero*[17] motion to strike the true finding on the strike allegation.

---

[16] The minute order states the stay was "purs. to Johnson case," presumably meaning *People v. Johnson* (2003) 109 Cal.App.4th 1230, 1237, 1239 (*Johnson*) [finding § 186.22, subd. (b)(1)(C) inapplicable to second-degree murder indeterminate sentence because § 186.22, subd. (b)(5) applies to " 'a felony punishable by imprisonment in the state prison for life' " and "requires that the defendant serve a minimum of 15 calendar years before being considered for parole"].

16

## II.    ISSUES RAISED IN THE ORIGINAL APPEALS

[The portion of this opinion that follows (part II) is deleted from publication.]

In this unpublished portion of the opinion, we address defendants' appellate arguments in the following order:  (1) exclusion of Barragan's statements; (2) claimed prosecutorial misconduct in the opening statement; (3) claimed prosecutorial misconduct during Deleone's testimony; (4) sufficiency of the evidence to support the gang enhancement; (5) admission of predicate offenses; (6) admission of certain slides in Gridley's PowerPoint presentation; (7) admission of defendants' statements; (8) sufficiency of the evidence corroborating Tommy's testimony about Mendoza; (9) admission of intimidation evidence; (10) claimed instructional error; (11) sufficiency of the evidence to convict Martell; (12) effectiveness of Martell's trial counsel; (13) the purported stay of the gang enhancements; and (14) cumulative error.

### A.  EXCLUSION OF BARRAGAN'S STATEMENTS

Defendants argue that the trial court erred by excluding statements Barragan had made to the police under a use immunity agreement, arguing they were admissible as declarations against interest.  (Evid. Code, § 1230.)  We review a trial court's evidentiary decisions for abuse of discretion.  (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).)

### 1.  Background

During trial, outside the jury's presence, defendants moved to introduce statements Javier Barragan had made to the police while under a grant of use immunity.  The district attorney's office had apparently agreed to consider entering into a plea agreement with Barragan in exchange for his complete and truthful answers to police officers' questions. The agreement stated:  "Should the prosecution decide not to extend such [plea] offer to Javier Barragan, the prosecution agrees: [¶] (1) not to use any statement ... against Javier

---

[17]    *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

Barragan in the prosecution's case-in-chief in ... any criminal matter ... regarding which he has provided information." (Capitalization omitted.)

After signing the immunity agreement, Barragan (accompanied by an attorney) spoke at length with Detectives Newton and Vallejo about the homicide. As relevant here, Barragan admitted actively participating in killing Garcia. Barragan stated that Mendoza came to 436 Ezie Street only briefly to buy "bud" and "dope" and that Mendoza left before the homicide occurred. Barragan appeared to suggest that Martell was minimally involved in the killing, stating that after assaulting Garcia, Barragan "looked back, like ' ... where's Martell,' you know, what the fuck? And I look, and he's in there, like, looking around, and I'm like, 'What the fuck's he looking for?' " Barragan also stated that Martell was "nowhere near there" after the assault and that Martell did not leave the scene of the homicide with the others.

Barragan's statements were inconsistent regarding Ramirez. He stated that Ramirez was one of the first people to run after Garcia and that "Ramirez pulled out his knife and used it against" Garcia. But later in the interview Barragan stated that Tommy and an unidentified teenager were the only two people who stabbed Garcia and that Ramirez was merely kicking Garcia.

Defendants argued the statements were admissible as statements against penal interest (Evid. Code, § 1230). The court denied defendants' motion.

### 2. Analysis

Out-of-court statements like Barragan's statements to the police are generally inadmissible to prove the truth of the matters asserted therein. (Evid. Code, § 1200.) A statement that would otherwise be hearsay is admissible if: the declarant had "sufficient knowledge of the subject"; the declarant is unavailable as a witness; and "the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by [the declarant] against another, or created such a risk of making [the declarant]

18

an object of hatred, ridicule, or social disgrace in the community, that a reasonable [person] in [the declarant's] position would not have made the statement unless [the declarant] believed it to be true." (Evid. Code, § 1230.) The " 'heart of this exception ... is ... the basic trustworthiness of the declaration.' " (*People v. Gordon* (1990) 50 Cal.3d 1223, 1251 (*Gordon*), disapproved on another ground by *People v. Edwards* (1991) 54 Cal.3d 787, 835.) Whether "trustworthiness is present requires the [trial] court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception." (*Gordon,* at p. 1251.)

The Supreme Court recently clarified that trial courts need not "sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant." (*Grimes*, *supra*, 1 Cal.5th at p. 716.) Instead, "courts must consider each statement in context" to determine whether the "statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest, such that 'a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true.' " (*Ibid.*) The Supreme Court noted that a statement is more likely to satisfy the against-interest exception when the declarant inculpates himself or herself while also exculpating someone else. However, "not all such statements are admissible; sometimes a declarant who makes an inculpatory statement may have a substantial incentive to exculpate others." For example, a "member of a criminal street gang ... may choose to take the fall for fellow gang members by making a confession that exculpates them." (*Ibid.*)

The trial court could reasonably find that Barragan's statements were insufficiently trustworthy for two reasons: (1) the statements were made in return for a promise of immunity; and (2) the statements were made about fellow gang members. Barragan's written agreement to be interviewed informed him that after the interview "the prosecution may offer to enter into a negotiated plea ... ." The agreement also

19

included a broad immunity clause under which the prosecution agreed not to use any statements made during the interview against Barragan "in the prosecution's case-in-chief in ... any criminal matter[, or] in the prosecution's case-in-chief in any matter in which he is criminally charged ... ." The trial court could reasonably conclude that Barragan's statements—made with the hope of a negotiated plea and with the knowledge that the statements could not be used in the prosecution's case-in-chief in any criminal matter against Barragan—were not made under circumstances that were so far contrary to Barragan's interests that a reasonable person in his position would not have made them unless he believed them to be true. (Evid. Code, § 1230.) Even if the agreement did not immunize Barragan from every conceivable penal consequence, the trial court could nonetheless find that the agreement made Barragan's statements insufficiently trustworthy.

Defendants attack the trial court's justification for excluding the statements, which was based on Justice Kennard's concurrence in *Gordon*, where she stated "it is well established that a statement made under a grant of immunity is not admissible as a declaration against penal interest." (*Gordon*, *supra*, 50 Cal.3d at p. 1281 (conc. opn. of Kennard, J.).) Though the trial court was not legally bound by that statement, Justice Kennard's discussion is persuasive authority that identifies a relevant factor to consider when evaluating the trustworthiness of a declarant's statements.

In addition to being made under an immunity agreement, Barragan's exculpatory statements about defendants were made about fellow gang members. The Supreme Court in *Grimes* cautioned that statements by a gang member exculpating fellow gang members might not meet the against-interest exception because a gang member "may choose to take the fall for fellow gang members by making a confession that exculpates them." (*Grimes*, *supra*, 1 Cal.5th at p. 716.) The gang expert testified that Barragan, Mendoza, and Martell were Norteño gang members, and that Ramirez was a Norteño gang associate. The trial court could reasonably conclude that Barragan had an incentive to

20

inculpate himself to protect fellow his gang members (i.e., defendants), which would vitiate the statements' trustworthiness. The trustworthiness of Barragan's exculpatory statements was particularly suspect here because Barragan knew, based on the immunity agreement, that he would suffer no penal consequences for incriminating himself to protect defendants.

Defendants' due process argument is without merit. The cases cited by defendants finding federal constitutional error all involved objectively trustworthy evidence that was excluded by mechanistic or erroneous application of evidentiary rules. (*Chambers v. Mississippi* (1973) 410 U.S. 284 [federal constitutional error where trial court excluded evidence that another person "had admitted responsibility for the murder on four separate occasions"]; *Green v. Georgia* (1979) 442 U.S. 95, 96–97 [federal constitutional error where Supreme Court found "substantial reasons" to assume the excluded statements' reliability]; *Cudjo v. Ayers* (9th Cir. 2012) 698 F.3d 752, 763 [federal constitutional error where "trustworthy and material exculpatory evidence was erroneously excluded"].) Because the trial court properly applied the hearsay exception and Barragan's statements lack the level of reliability that would support a showing of federal constitutional error, there was no due process violation in the trial court's decision to exclude Barragan's statements. (See *Miller v. Stagner* (9th Cir. 1985) 757 F.2d 988, 995 [reviewing courts "must give due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable or prejudicial evidence."].)

## B. MISCONDUCT IN OPENING STATEMENT

### 1. Statements About Rivas's Veracity

Defendants argue the prosecutor improperly vouched for the credibility of Salvador Rivas. A prosecutor may not vouch for the credibility of witnesses by referring to evidence outside the record but may mention the " 'apparent honesty or reliability' " of witnesses so long as that statement is based on facts in the record as well as reasonable inferences drawn from those facts. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 39.)

21

The prosecutor described Rivas's expected testimony, stating: "And he can't see any stabbing, but can ... see that everyone in this group is participating. He says five to seven people. This is what he -- he was cooperative with the police and told them that much. And I believe that he will be a cooperative and an honest witness here in court."

There was no suggestion by the prosecutor that he was relying on personal knowledge outside of what he intended to present as evidence to vouch for Rivas. He merely expressed a belief that he thought Rivas would testify honestly and implied that he based that belief on Rivas's cooperation with the police. The prosecutor's comments did not amount to improper vouching.

### 2. Stating that Defendants Lied to Police

Defendants argue that the prosecutor improperly denigrated them by stating that they lied to police. "Prosecutors 'are allowed a wide range of descriptive comment and the use of epithets which are reasonably warranted by the evidence,' " and they may make fair comments on what they anticipate the evidence may show. (*People v. Farnam* (2002) 28 Cal.4th 107, 168 [finding no misconduct where prosecutor referred to the defendant during opening statement as monstrous, cold-blooded, and a predator].)

The prosecutor here told the jury that officers would testify about their interviews with the defendants. The prosecutor argued that when confronted with evidence that his cellular phone was at the scene, Martell "gives them a lie. He does not give any explanation, that he just watched, or that he was acting in self-defense. [¶] He says: 'No. No. I wasn't there.' And then gives this phony alibi ... ." The prosecutor continued: "The police ... arrest Juan Ramirez. 'Look, we know you were there. Just tell us what happened.' Give them an opportunity to tell their evidence. ... [¶] Juan Ramirez lies. He doesn't say: 'I just watched. I didn't participate.' He says: 'No. Wasn't there. I may have been drunk one time two months ago, but I wasn't at no murder scene on Ezie Street.' " As for Mendoza, the prosecutor stated Mendoza denied he was at Ezie Street the night of the murder and "[l]ies to the police." The prosecutor concluded: "The

22

evidence will show you that all these defendants lied because they knew they were guilty of first degree murder."

Rather than labeling them generally as liars, as defendants suggest on appeal, the prosecutor stated that each defendant lied in a specific context (i.e., when asked by police whether he was present at the scene of the homicide). The prosecutor could reasonably expect the evidence to show that the defendants were indeed present on Ezie Street on the night of the homicide based on the anticipated testimony of Tommy and Raymond Jr., as well as physical evidence including DNA and fingerprints. The prosecutor's statements were not improper.

### 3. Claimed *Griffin* Error

Defendants argue that the prosecutor improperly commented on the defendants' failure to explain when given "an opportunity to tell their evidence" when questioned by the police. A prosecutor's comment on a defendant's silence violates the Fifth Amendment to the United States Constitution. (*Griffin*, *supra*, 380 U.S. 609, 615 ["[T]he Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."].)

The prosecutor stated during his opening statement that the police gave defendants "an opportunity to tell their evidence" and that "all these defendants lied" when given that opportunity. Counsel for Ramirez (joined by the other defendants) asserted *Griffin* error during his mistrial motion, arguing that "it was very subtle, but it's [*Griffin*] error, because my client asked for an attorney, and [the prosecutor] should not be allowed to say my client wouldn't cooperate."

Defendants argue that after the jury heard that defendants lied to the police when given an opportunity to explain themselves, the jury was "improperly encouraged ... to consider [defendants'] assumed decision not to testify at trial when considering"

23

defendants' statements to police. They continue that because the prosecutor called attention to defendants' failure to testify, the jury necessarily took the prosecutor's statements as a comment on their failure to testify.

The prosecutor did not focus on defendants' silence, but rather on their assertions that they were not involved in the homicide. The prosecutor characterized defendants' assertions as lies, based on the evidence he intended to present. As discussed in the preceding section, the prosecutor stated that defendants lied in a specific context. Contrary to defendants' argument, taking the stand at trial was not "the only means to redeem [defendants'] credibility ... ." Defendants could have supported their pretrial assertions of non-involvement by attacking the prosecutor's circumstantial evidence of defendants' presence or by presenting evidence of their own. Thus, we do not find that the prosecutor's statement could reasonably be construed by the jury as a comment on defendants' failure to testify at trial.

### 4. Reference to Deleone's Girlfriend's Motive to Dispose of Weapons

Mendoza and Ramirez argue that the prosecutor committed misconduct by referencing facts that the prosecutor knew could not be introduced into evidence. "The purpose of the opening statement is to inform the jury of the evidence the prosecution intends to present, and the manner in which the evidence and reasonable inferences relate to the prosecution's theory of the case." (*People v. Millwee* (1998) 18 Cal.4th 96, 137.) Remarks made during an opening statement are not impermissible misconduct "unless the evidence referred to by the prosecutor 'was "so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted." ' " (*People v. Wrest* (1992) 3 Cal.4th 1088, 1108 (*Wrest*).)

#### a. Background

Deleone testified during Mendoza's grand jury proceedings that Barragan and others came to his apartment with "bloody weapons and a bloody sweatshirt." The people who came over wanted the weapons washed and Deleone's girlfriend "told

24

everybody that she was going to wash them and dispose of them." Deleone stated that the weapons were "wrapped up in a dark sweatshirt" and that while he did not see the weapons, he knew what they were because his girlfriend told him what they were. He answered in the affirmative when the prosecutor asked him if he used to buy methamphetamine "from the Barragans ... ."

The prosecutor told the jury in his opening statement that he expected Deleone to testify that Barragan, Ramirez, and another person came to his apartment with "weapons, which Javi, Mr. Barragan, had wrapped up in a black sweatshirt, that [Deleone's] girlfriend took these weapons and disposed of them for these guys. She was also a meth user, wanted to continue to participate in getting meth." There was no contemporaneous objection but counsel for Ramirez included argument on this point in the mistrial motion he made after the opening statement.

The prosecutor asked Deleone at trial about his drug source. Deleone testified that he did not get his drugs from Javier Barragan, stated that he knew Barragan's brother, and responded "Yeah" when the prosecutor asked: "Did you get drugs from either of them?" The trial court sustained a relevance objection to the prosecutor's next question ("Who?").

### b. Analysis

Mendoza and Ramirez argue that the prosecutor's opening statement informed the jury that defendants brought weapons to Deleone's apartment and that Deleone's girlfriend disposed of those weapons to support her methamphetamine habit even though the prosecutor knew he could not provide evidence to support those facts. Regardless of Deleone's personal knowledge (or lack thereof), the prosecutor's statement about the presence of weapons is supported by Tommy's trial testimony that he and Barragan brought weapons to the house and handed them to Deleone's girlfriend.

As for Deleone's girlfriend's motive to dispose of the weapons, the prosecutor did not produce direct evidence at trial regarding a motive. However, when he made his

25

opening statement the prosecutor knew that Deleone had testified to the grand jury that at the time of the homicide Deleone's girlfriend obtained her methamphetamine from Deleone, who purchased it from the Barragans. Based on that grand jury testimony, the prosecutor could reasonably expect Deleone to give the same testimony at trial and it is a reasonable inference that Deleone's girlfriend would help a drug dealer dispose of evidence due to a desire to continue receiving methamphetamine. Further, while the jury never heard which of Barragan's family members was Deleone's drug supplier because the trial court sustained a relevance objection to the prosecutor's question, the prosecutor did not know when he made his opening statement that the court would later sustain that objection. And that evidence was not so patently inadmissible that the prosecutor should have known the trial court would sustain an objection. (See *Wrest*, *supra*, 3 Cal.4th at p. 1108.)

### 5. Reference to Ramirez Dealing Drugs

Ramirez argues the prosecutor committed misconduct by stating that Ramirez dealt drugs even though "the prosecutor had never identified drug dealing as a bad act on which he intended to rely." Ramirez appears to argue that the prosecutor's reference to drug dealing violated a pretrial order, which would constitute misconduct. (*People v. Silva* (2001) 25 Cal.4th 345, 373 ["[I]t is misconduct to elicit or attempt to elicit inadmissible evidence in violation of a court ruling ... ."].)

#### a. Background

Ramirez filed a pretrial motion in limine, entitled "Alleged Juvenile Bad Acts and/or Acts of Moral Turpitude," that specifically referenced two bad acts: Ramirez's arrest in the early morning of August 28, 2011 for being drunk in public, and Ramirez's arrest in September 2011 for a "beer run" where he stole a case of beer from a convenience store. (Emphasis omitted.) The motion stated that Ramirez believed the prosecution would seek to admit evidence of "these bad acts" and sought to exclude "any

26

mention of this evidence" under Evidence Code section 352. The trial court granted the motion.

During his opening statement, the prosecutor said: "Barragan and Juan Ramirez, they are tight. I believe Mr. Deleone will tell you that when Javier Barragan was arrested for his attempted murder as a juvenile, he went away, also, to C.Y.A. And during that time, it was Juan Ramirez who took his cell phone and conducted the drug-dealing that he'd been doing on his behalf during that time period." There was no contemporaneous objection but counsel for Ramirez argued in his oral mistrial motion after the prosecutor's opening statement that he had previously moved to exclude "all, not just convictions, but all bad acts of my client ... . And the court ruled in my favor."

### b. Analysis

On appeal, Ramirez argues that "[a]t no time, in any brief or argument, did the prosecutor reveal an intention to suggest that Mr. Ramirez was a drug dealer." But Ramirez does not identify any legal duty requiring the prosecutor to have done so. Ramirez suggests that his pretrial motion sought to exclude "any prior bad acts," but his motion was not so broad. Apparently based on information received from the prosecution, the motion specified two bad acts, neither of which was drug dealing. Ramirez's motion did not mention, much less seek to exclude, evidence that Ramirez dealt drugs, nor did he raise that bad act at the pretrial hearings on the motion. As Ramirez has not demonstrated that he sought to exclude evidence that he dealt drugs, the prosecutor was under no obligation to withhold discussion of that topic.

## C. PROSECUTOR'S DIRECT EXAMINATION OF DELEONE

### 1. Testimony About Weapons

Mendoza and Ramirez contend that the prosecutor committed misconduct by asking Deleone questions he knew would elicit inadmissible hearsay. "[A] prosecutor may not ' "ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist." ' " (*People v. Young* (2005) 34 Cal.4th 1149,

27

1186; *People v. Bonin* (1988) 46 Cal.3d 659, 689 ["It is, of course, misconduct for a prosecutor to 'intentionally elicit inadmissible testimony.' "], overruled on another ground by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 (*Hill*).)

### a. Background

Deleone testified during Mendoza's grand jury proceedings that he never saw weapons the night of the homicide and knew about them only because his girlfriend told him about them.

At trial, the prosecutor asked Deleone if the people who came to his apartment the night of the homicide brought weapons and, after Deleone answered affirmatively, asked Deleone: "What kind of weapons?" Deleone testified that the weapons were a knife, a box cutter, and a Philips-head screwdriver. Defense counsel objected that the testimony was based on hearsay, which the trial court initially overruled. When Deleone later testified that "I don't really think I seen [the weapons], but my girlfriend told me they were there," the trial court struck "the testimony relating to the Philips screwdriver and the box cutter and the knife" and instructed the jury to "[d]isregard it." Deleone testified that he heard "all the stuff" that was in the black sweatshirt one of the people who came to the apartment brought "rattling around in the sink."

The prosecutor next referred to "weapons" in the following two questions: "And you never saw the weapons after that?"; "You never saw the weapons after you heard that rattling around and the water in the sink?" The court sustained objections to each of those questions on the ground that they misstated the testimony. The trial court denied a renewed mistrial motion at a hearing outside the presence of the jury, reminding "all counsel that there has to be a good faith basis for any and all questions" but finding that "given the nature of the testimony that was to be anticipated from Mr. Deleone, who really knew what he was going to say[?]"

28

### b. Analysis

We see no error in the trial court's implicit finding that there was a good faith basis for the prosecutor's initial question about weapons. Though the prosecutor was likely aware that Deleone had testified during the grand jury proceedings that he never saw the weapons, the prosecutor also knew, as Deleone freely admitted at trial, that Deleone had been a heavy methamphetamine user at the time of the homicide and that his prior drug use adversely affected his ability to remember things. Based on that history, the prosecutor could reasonably believe at trial that Deleone might remember personally seeing the weapons. However, once Deleone testified at trial that he had not seen the weapons, the prosecutor no longer had any good faith basis for continuing to refer to "weapons" in further questions to Deleone. The trial court correctly sustained objections to those questions and instructed the prosecutor to rephrase.

Mendoza and Ramirez argue that despite the trial court's proper response to those questions, the prosecutor's misconduct in asking the questions constitutes reversible error. Mendoza argues that the error should be reviewed under the harmless-beyond-a-reasonable-doubt standard applicable to federal constitutional error but does not explain why that standard applies. The cases he cites regarding prosecutorial misconduct apply the test applicable to state law error: whether there is a reasonable probability that he would have received a more favorable result had the error not occurred. (Citing *People v. Wagner* (1975) 13 Cal.3d 612, 620 [citing Cal. Const., art. VI, § 13]; see also *People v. Johnson* (1978) 77 Cal.App.3d 866, 874 [" '[M]isconduct will cause reversal if it caused a miscarriage of justice, that is, if there is a reasonable probability that it shifted the verdict.' "]; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) We likewise apply the *Watson* standard.

The trial court struck Deleone's testimony regarding weapons, instructing the jury to "[d]isregard it." The court also sustained objections to the prosecutor's reference to "weapons" in later questions to Deleone. We presume the jury followed those specific

29

instructions, as well as the general provisions of CALCRIM No. 222 that the attorneys' "questions are not evidence." (*People v. Boyette* (2002) 29 Cal.4th 381, 453 (*Boyette*).) Further, the jury heard testimony from Tommy about the weapons the defendants allegedly used during the attack, and Tommy further testified that Mendoza and Ramirez made statements while fleeing the attack suggesting they used weapons. Mendoza and Ramirez have not demonstrated a reasonable probability of a more favorable result had the prosecutor not asked the improper questions.

### 2. Improperly Refreshing Deleone's Recollection

Mendoza argues, and the People essentially concede, that the prosecutor improperly refreshed Deleone's recollection by reading an excerpt from Deleone's grand jury testimony out loud in front of the jury. "Statements which have no independent basis of admissibility may not be introduced under the guise of refreshing a witness' memory. If it is necessary to refresh the memory of a witness through the use of a prior recorded statement, that statement should not be read aloud before the jury but should be given to the witness to read or be read by the attorney outside the presence of the jury." (*People v. Parks* (1971) 4 Cal.3d 955, 960–961 (*Parks*).)

#### a. Background

Deleone testified at trial that on the night of the homicide, Barragan and Ramirez came into his apartment but that he did not "remember any other people coming in [his] house." The prosecutor asked Deleone: "Do you remember testifying at the grand jury, and you weren't sure about this, but that you thought that a third person, Travi, came in?" Mendoza's trial counsel objected that the prosecutor was leading the witness, which the court overruled. Deleone testified: "Yeah, I thought there was a third person. I wasn't sure who it was." The prosecutor eventually read from the grand jury transcript: "My question to you, line 24: [¶] 'What happens on this occasion? Who came over on this occasion?' [¶] Your answer was: [¶] 'I remember Javi, Javier, Juan, and somebody else. I don't remember who the other person -- I think it was Travi, but I couldn't be certain.' "

30

### b. Analysis

As the People concede that the prosecutor improperly refreshed Deleone's recollection, the only dispute is whether that error was prejudicial. Mendoza cites *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) as the appropriate standard for prejudice, but does not demonstrate how the prosecutor's action violated any of Mendoza's federal constitutional rights. Absent a showing that Mendoza's federal constitutional rights were violated, we consider whether it is reasonably probable that he would have obtained a more favorable result had the error not occurred. (*Parks*, *supra*, 4 Cal.3d at p. 961, citing *Watson*, *supra*, 46 Cal.2d at p. 836.)

At trial, Deleone testified that he could not remember the name of the third person who came to his house the night of the homicide. He was not even sure if a third person accompanied Barragan and Ramirez at all. Though it was damaging to Mendoza to have the jury hear that Deleone had previously indicated at the grand jury hearing that Mendoza might have been present, the grand jury testimony was equivocal. Deleone stated he thought Mendoza was the third person, "but I couldn't be certain." During extensive cross-examination at trial by all three defendants' attorneys, Deleone consistently acknowledged both generally that he had a poor memory due to his history of heavy methamphetamine use and specifically that he could not remember the identity of the third person who came to his apartment. Deleone also testified that during at least one interview with police he had identified Tommy as the third person. The only other testimony the jury heard regarding who was present at the apartment came from Tommy, who testified that only he and Barragan went up to the apartment.

Further, whether Mendoza actually entered Deleone's apartment was of secondary importance to the prosecution's case. On the more fundamental issue of whether Mendoza was with the other assailants in the hours after the homicide, the prosecution presented independent supporting evidence. For example, Tommy testified that Mendoza participated in the attack and fled with the others. The prosecution also introduced

31

evidence showing that calls from a cellular phone associated with Mendoza connected through towers in the vicinity of the crime scene around the time of the crime (around 10:00 p.m.), through a tower closer to Deleone's house closer to 11:00 p.m., through a tower near Barragan's mother's house after 11:00 p.m., and through a tower in Milpitas shortly after 2:00 a.m. Those locations are consistent with Tommy's testimony about the group's flight. On this record, Mendoza has not demonstrated that it is reasonably probable that he would have obtained a more favorable result had the jury not heard Deleone's grand jury testimony.

### D. GANG ISSUES

All three defendants argue that insufficient evidence supported their gang enhancements. Mendoza and Ramirez argue that the prosecution was allowed to present an unduly prejudicial number of predicate offenses and also contend that certain slides in the gang expert's slideshow were unduly prejudicial.

#### 1. Gang Expert Testimony

Detective Chris Gridley was a gang detective with more than 100 hours of training about gangs, including training specifically about Hispanic gangs in San Jose. This was his first homicide investigation as a gang expert. He testified that indicia of gang membership he looks for when determining whether an individual is a gang member include: use of gang symbols, hand signs, and clothing; admission of gang affiliation; association with known gang members; tattoos; and prior gang-related criminal conduct.

Gridley testified that he was "familiar with a gang called the Nortenos." He stated that the gang has approximately 2,000 members in San Jose and that their "territory would be considered Bakersfield north to Northern California." The primary activities of the Norteño gang include assault with a deadly weapon, homicide, drive-by shootings, car theft, robbery, and burglary. Norteño gang members commonly carry weapons for protection and for use in attacks. Violence is common and is used to gain respect from other gang members and to intimidate non-gang members. It is common for gang

32

members to support themselves by selling drugs. Common names, signs, and symbols for the Norteño gang include: Norte, Norteño, Northerner, the color red, the number 14, the Huelga bird symbol, the San Jose Sharks symbol, and "compass-bearing points for San Jose, such as East Side San Jo, E.S.S.J."

Gridley stated that the Norteño gang is an informal gang. The Norteño gang is affiliated with the Nuestra Familia prison gang, which Gridley described as "the pinnacle of Norteño prison gangs." At the local level, gang members sometimes create formal subsets that claim specific territory. While street gangs "derive a history" from the Nuestra Familia, "not all Northerner gang members are affiliated" with the Nuestra Familia. The Nuestra Familia influences Norteño street gangs to "a certain extent" through sending out kites[18] that "may be disseminated down to the street level." But Gridley testified that in his experience, "some of our subsets in San Jose don't align themselves with the N.F." Further, some Norteño gang members are what Gridley termed "solo Northerners," who do not follow orders from the Nuestra Familia or any formal subset.

The Norteño gang's main rival is the Sureño gang. Gridley stated that if a Sureño gang member walks into a Norteño neighborhood, it is likely he will be challenged, and possibly attacked, by Norteño gang members. Based on pictures taken of graffiti in the neighborhood surrounding 436 Ezie St., Gridley opined that it was a Norteño neighborhood that was specifically claimed by a Norteño subset called Seven Trees. There was no evidence that any of the defendants were part of the Seven Trees subset.

Gridley opined that the Norteño gang has engaged in a pattern of criminal gang activity, based on seven predicate offenses. In 2001, Tommy Gonzalez admitted committing assault with a deadly weapon with a gang enhancement as a juvenile in Gilroy. Gridley testified that Tommy or another suspect called the victims " 'scraps' "

---

[18] Detective Gridley explained that a kite is a method of communicating in jail by sending messages written on a small strips of paper.

33

and Tommy hit a victim's car multiple times with a bat. In 2004, Barragan admitted committing attempted murder with a gang enhancement in Stanislaus County. Gridley testified that Barragan was visiting "two other Northerners" when a Sureño drove by and that Barragan eventually shot the car the victim was driving multiple times. In 2007, Mendoza admitted robbing someone as a juvenile in San Jose. Despite the lack of a gang enhancement allegation in Mendoza's robbery adjudication, Gridley opined that the offense was related to Norteño gang activity because Mendoza asked the victim if he "bangs," which Gridley described as a "street check" that gang members sometimes ask perceived rivals.[19] In 2008, Martell admitted committing assault with a deadly weapon with a gang enhancement in San Jose as a juvenile. Gridley testified that Martell was in a group of "Northerners" that challenged another group to a fight "by calling them 'Scraps' and yelling out 'Norte.'" A fight ensued, an individual in the group referred to as Scraps was stabbed, and Martell pleaded guilty to that stabbing.

In addition to predicate offenses involving defendants or accomplices to Garcia's homicide, the prosecution offered additional predicate offenses committed by other individuals. In 2010, Jose Sotelo pleaded no contest to felony vandalism with a gang enhancement in San Jose. Gridley testified that Sotelo was "a Northerner gang member." In 2010, Orlando Heredia and Miguel Hurtado pleaded no contest to assault with a deadly weapon with gang enhancements in San Jose. Gridley testified that in that case the victim was walking through "a known Norteño hood claimed by Triple L., Los Latinos Locos" and a suspect (presumably Heredia or Hurtado) cut the victim's chin while the other suspect "yells 'Norte' and also pulls out a knife." In 2010, Andy Martinez pleaded guilty to assault with a deadly weapon with a gang enhancement in San Jose. Gridley

---

[19] Though all of the predicate offenses involved a suspect or were for crimes committed in Santa Clara County, Detective Gridley agreed on cross-examination with Ramirez's attorney's statement that based on Gridley's theory about the breadth of the Norteño gang's territory, "you could just as well have brought in a criminal act by somebody in Fresno that was a Norteño, or Crescent City, or Sacramento ... ."

34

testified that a group of what the victim apparently identified as "Northerners" challenged the victim to fight while yelling " 'Puro Norte,' " and that Martinez eventually threw a brick through the victim's car window.

Regarding the gang membership of the defendants and other suspected perpetrators, Gridley opined that Barragan and Tommy were active Norteño gang members, based on each of them self-identifying as Norteños and on their previous convictions for Norteño-related offenses. Gridley thought Martell was an active solo Norteño gang member who was not affiliated with any subsets. That opinion was based on Martell's tattoos; the presence of his name on a jail kite found after the homicide; his criminal history; his mode of dress; and Martell's admission during a 2011 field interview that he had been a Norteño since he was 12 years old. Gridley believed Mendoza was an active Norteño gang member based on his admission during booking; his tattoos (Gridley opined the "U" and "Unidos" were gang-related rather than being related to a Utah college); his juvenile adjudication where he asked the victim if he "banged"; and the facts of the present case.

Regarding Ramirez, the prosecutor asked Gridley "whether Mr. Ramirez is a member of the Norteño gang," and Gridley stated he "found him to be an associate," or someone who was working to become a gang member. That opinion was based on Ramirez's "East Side" tattoo, Tommy's statement that Ramirez was "putting in work" to benefit the gang, and Ramirez's close association with Barragan. Gridley acknowledged that Ramirez had no criminal record, no arrests, and no gang-related field identifications before this case. Finally, Gridley opined that Maurillo Garcia was a Sureño gang member (and therefore a rival to defendants) based on his tattoos and on the graffiti he spray-painted being Sureño-related.

In addition to being Norteño gang members, Gridley testified that Barragan, Mendoza, and Ramirez were part of a Norteño subset called San Jose Unidos. Gridley had never heard of that subset before working on this case and said he learned about it

35

from Tommy, Deleone, and another gang detective. Deleone had apparently told police during an interview that Barragan "and others" were members of San Jose Unidos. Gridley testified that Deleone referred to San Jose Unidos as " 'the U' " and Gridley believed Mendoza's "U" and "Unidos" tattoos demonstrated his affiliation with the subset. Gridley was not aware of any affiliation or relationship between San Jose Unidos and the subset who claimed the neighborhood where the homicide occurred (Seven Trees). On cross-examination, counsel for Mendoza asked Gridley: "And the reason that you are using Norteño as the sort of umbrella street gang is because I think you said that there are no crimes that have been committed by the subset S.J.U. if it exists, right?" Gridley responded: "I did not find any predicates by them, no," and also acknowledged that he found no evidence of any criminal activity by the San Jose Unidos subset before the homicide in this case.

Gridley opined that the homicide was gang-related. He believed defendants committed the homicide for the benefit of, and in association with, the Norteño gang based on the way the defendants worked together to carry out the assault. The homicide benefited the Norteño gang by increasing the gang's respect and intimidating others in the neighborhood.

### 2. Sufficiency of the Evidence to Support Gang Enhancement

Citing *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), defendants argue that the evidence was insufficient to support the finding that the Norteños were a criminal street gang. Defendants were alleged to have murdered Maurillo Garcia "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members ... ." (§ 186.22, subd. (b)(1).) The prosecution's theory during closing argument was that the crimes were committed for the benefit of the Norteño gang.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is

36

reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*).) We presume the "existence of every fact that the trier of fact could reasonably deduce from the evidence" to support the judgment. (*People v. Medina* (2009) 46 Cal.4th 913, 919 (*Medina*).) To overturn a conviction, "it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

### a. Section 186.22 and *Prunty*

Section 186.22, subdivision (f) defines a criminal street gang as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [certain enumerated] criminal acts ... , having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." Those enumerated offenses are called predicate offenses. (*People v. Tran* (2011) 51 Cal.4th 1040, 1044 (*Tran*).) Section 186.22, subdivision (e), in turn, defines a pattern of gang activity as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses" listed in the subdivision, "provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons ... ."

In *Prunty*, the Supreme Court addressed "what type of showing the prosecution must make when its theory of why a criminal street gang exists turns on the conduct of one or more gang subsets." (*Prunty*, *supra*, 62 Cal.4th at p. 67.) The court reviewed the definition of "criminal street gang" in section 186.22, subdivision (f) and determined that "where the prosecution's case positing the existence of a single 'criminal street

37

gang' ... turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets." (*Prunty*, at p. 71.) The court decided that the statute's reference to an " 'ongoing organization, association, or group' " is a "distinct requirement" and cannot be satisfied merely by showing "shared colors, names, and other symbols." (*Id.* at pp. 74–75, quoting § 186.22, subd. (f).)

The *Prunty* court presented an expressly non-exclusive list of methods prosecutors can use to establish that "the 'gang' that the defendant sought to benefit, and the 'gang' that the prosecution proves to exist, are one and the same." (*Prunty*, *supra*, 62 Cal.4th at p. 75.) Prosecutors might provide evidence that multiple subsets are connected by some form of hierarchy. Examples of that sort of proof include evidence that multiple subsets each have a " 'shot caller' " who answers to a higher authority within the chain of command; engage in independent activities that benefit the same higher ranking individual or group (e.g., "various Norteño subset gangs that share a cut of drug sale proceeds with the same members of the Nuestra Familia prison gang"); are governed by the same bylaws; act to protect the same territory; or conduct "independent, but harmonious, criminal operations within a discrete geographical area ... ." (*Id.* at pp. 77–78.) Absent evidence of a hierarchy, prosecutors might provide evidence of "collaboration, unity of purpose, and shared activity" sufficient to support a finding of a single organization, association, or group. Examples of that sort of proof includes evidence that multiple subsets: work in concert to commit a crime; profess or exhibit loyalty to one another; have fluid or shared membership among subsets; or have a " 'liaison' " who coordinates relations between subsets. (*Id.* at p. 78.) Finally, prosecutors can demonstrate that multiple subsets "manifest specific behavior" that suggests a shared identification with a single group. Examples of that sort of proof include evidence that: "a certain Norteño subset retaliates against a Sureño gang for affronts that gang has committed against other Norteño subsets"; or multiple subsets

38

within a geographic area require prospective members to perform the same initiation activities. (*Id.* at pp. 79–80.)

The *Prunty* court noted that nothing in that opinion should be construed to reflect "any skepticism regarding the general factual question of whether the Norteños exist" and noted that the court had "previously upheld gang enhancements where the 'criminal street gang' in question was a geographically dispersed group."[20] (*Prunty, supra,* 62 Cal.4th at p. 85.)

### b. Analysis

The prosecution's theory was that defendants murdered Garcia for the benefit of "the Norteño gang" rather than any gang subset.

Gridley testified that the Norteño gang has about 2,000 members. According to Gridley, Tommy, Barragan, Mendoza, and Martell were all Norteño gang members. Ramirez was a Norteño gang associate. That evidence supported a finding that the Norteño gang had three or more members. (§ 186.22, subd. (f).)

Gridley testified that the Norteño gang's primary activities include assault with a deadly weapon (§ 186.22, subd. (e)(1)), homicide (§ 186.22, subd. (e)(3)), drive-by shootings (§ 186.22, subd. (e)(6)), car theft (§ 186.22, subd. (e)(9) [grand theft]), robbery (§ 186.22, subd. (e)(2)), and burglary (§ 186.22, subd. (e)(11)). That testimony supported a finding that the Norteño gang's primary activities included "commission of one or more of the criminal acts enumerated" in section 186.22, subdivision (e)(1) through (e)(25) or (e)(31) through (e)(33). (§ 186.22, subd. (f).)

---

[20] *Prunty* disapproved *In re Jose P.* (2003) 106 Cal.App.4th 458, where a different panel of this court found that the prosecutor had provided sufficient evidence supported the existence of "the Norteño gang." (*In re Jose P.*, at pp. 467–468; disapproved by *Prunty, supra,* 62 Cal.4th at p. 78, fn. 5.) But the *Prunty* court noted that the prosecution's evidence in *In re Jose P.* "was likely sufficient to satisfy the framework" laid out in *Prunty.* (*Prunty,* at p. 78, fn. 5.)

Gridley testified that common names, signs, and symbols for the Norteño gang include:  Norte, Norteño, Northerner, the color red, the number 14, the Huelga bird symbol, the San Jose Sharks symbol, and compass-bearing points for San Jose.  That evidence supported a finding that the Norteño gang has "a common name or common identifying sign or symbol."  (§ 186.22, subd. (f).)

As for the requirement in section 186.22, subdivision (f) that the prosecution prove the Norteño gang "engaged in a pattern of criminal gang activity," the prosecution could do so by showing that two or more predicate offenses were committed (or attempted) on separate occasions, and that the last of the predicate offenses occurred within three years after a prior offense.  (§ 186.22, subdivision (e).)  Gridley discussed several prior offenses committed either by the current defendants (Mendoza and Martell) or their accomplices (Tommy and Barragan), all of whom Gridley identified as Norteño gang members.  Tommy admitted committing assault with a deadly weapon with a gang enhancement as a juvenile in 2001.  Assault with a deadly weapon is a predicate offense. (§ 186.22, subd. (e)(1).)  Barragan admitted committing attempted murder with a gang enhancement as a juvenile in 2004.  Homicide is a predicate offense.  (§ 186.22, subd. (e)(3).)  Mendoza admitted robbing someone as a juvenile in 2007, and Gridley opined that the robbery was related to Norteño gang activity based on the circumstances of the case.  Robbery is a predicate offense.  (§ 186.22, subd. (e)(2).)  And Martell admitted committing assault with a deadly weapon with a gang enhancement as a juvenile in 2008.  There was therefore evidence of two or more predicate offenses committed by two or more Norteño gang members, and Martell's juvenile adjudication occurred within three years after Mendoza's juvenile adjudication.

*Prunty* clarified that section 186.22 also "requires the prosecution to introduce evidence showing an associational or organizational connection that unites members of a putative criminal street gang."  (*Prunty*, *supra*, 62 Cal.4th at p. 67.)  In the instant case, the prosecutor provided evidence of an associational connection by introducing predicate

offenses committed by the very same individuals who were involved in Garcia's homicide. Because the prosecutor also presented evidence that Tommy, Mendoza, Barragan, Martell, and Ramirez were all at Tommy's house the night of the homicide, defendants cannot reasonably argue they had no connection to one another. The evidence in this case is therefore different from the evidence presented in *Prunty*, where the predicate offenses introduced by the prosecution were committed by individuals other than the current defendant and there was no evidence connecting those individuals to the defendant. (*Prunty*, at pp. 82–85.)

The prosecution presented sufficient evidence for a reasonable trier of fact to find that defendants' gang qualified as a criminal street gang beyond a reasonable doubt. (*Bolin*, *supra*, 18 Cal.4th at p. 331.)

### 3. Predicate Offenses

Mendoza and Ramirez argue that the trial court admitted an unduly prejudicial number of predicate offenses. (Evid. Code, § 352.) We review the trial court's decision for abuse of discretion. (*Tran*, *supra*, 51 Cal.4th at p. 1049.)

#### a. Legal Principles

In *Tran*, the Supreme Court provided guidance regarding an Evidence Code section 352 objection to predicate offenses in the related context of showing a defendant's active participation in a criminal street gang. (*Tran*, *supra*, 51 Cal.4th at p. 1048; § 186.22, subd. (a).) The court acknowledged that "evidence a defendant committed an offense on a separate occasion is inherently prejudicial" but explained that "Evidence Code section 352 requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect." (*Tran*, at p. 1047, italics in original.) Evidence is less likely to be prejudicial if it comes from "a source independent of evidence of the charged offense" or if the previous offense "is no stronger or more inflammatory than the testimony concerning the charged offense." (*Ibid.*) Evidence of uncharged criminal acts that did not result in a criminal conviction has a higher

41

prejudicial effect. (*Ibid.*) The *Tran* court concluded that "evidence of a defendant's separate offense may be admissible to prove a predicate offense" but cautioned that while a trial court "need not limit the prosecution's evidence to one or two separate offenses lest the jury find a failure of proof as to at least one of them, the probative value of the evidence inevitably decreases with each additional offense, while its prejudicial effect increases, tilting the balance towards exclusion." (*Id.* at p. 1049.)

### b. Mendoza's Juvenile Adjudication was Properly Admitted

The trial court overruled Mendoza's Evidence Code section 352 objection to Gridley's use of Mendoza's juvenile adjudication for robbery as a predicate offense. The court noted that Detective Newton had already testified that Mendoza admitted having suffered a prior juvenile adjudication, meaning "there is prejudice that's already occurred." Mendoza argues that the court abused its discretion because Detective Newton's testimony about the adjudication was general and Gridley went into greater detail by opining that even though the robbery was not charged as a gang-related offense, Mendoza's conduct of asking the victim " 'Do you bang?' " was consistent with gang activity (specifically, as evidence of a street check).

Whether Mendoza was affiliated with the Norteño street gang was a disputed issue at trial. Although he acknowledged during his police interview that he claimed "Northern," Mendoza denied being a gang member. Evidence that Mendoza engaged in a street check was highly probative of whether he was a gang member. Mendoza has not demonstrated that the inherently prejudicial nature of the sustained juvenile adjudication posed such an intolerable risk of prejudice that the court should have excluded it. (*Tran*, *supra*, 51 Cal.4th at p. 1047 [" 'Evidence is substantially more prejudicial than probative ... [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' "].)

### c. Predicate Offenses Were Not Unduly Prejudicial or Cumulative

Four of the seven predicate offenses were committed by individuals who were allegedly involved in Garcia's murder, including Barragan, Martell, Tommy, and Mendoza. Three of those convictions specifically included gang enhancements and Gridley opined that the fourth offense (Mendoza's) was gang-related. Those four predicate offenses were highly probative because they provided support for the prosecutor's theory that those four individuals killed Garcia for the benefit of the Norteño street gang. (See *Tran*, *supra*, 51 Cal.4th at p. 1048 [evidence of a defendant's prior gang-related offense "provides direct evidence of a predicate offense ... and that the defendant knew the gang engaged in a pattern of criminal gang activity."].) As for the three predicate offenses committed by other people, the crimes of which they were convicted (assault with a deadly weapon and felony vandalism) were less serious than the murder charges defendants faced. Further, all seven predicate offenses were convictions and not merely uncharged criminal conduct, meaning there was less risk that the jury would be confused about the issues in the case. (See *Tran*, *supra*, 51 Cal.4th at p. 1047 [uncharged acts not resulting in conviction are more prejudicial "because the jury might be inclined to punish the defendant for the uncharged acts regardless of whether it considers the defendant guilty of the charged offense"].) On this record, defendants have not demonstrated an abuse of discretion.

### 4. Gang Expert's PowerPoint Presentation

Mendoza and Ramirez argue the trial court erred in overruling their objections to four slides included in Gridley's PowerPoint presentation. Evidentiary rulings are reviewed for abuse of discretion. (*People v. Thomas* (2011) 51 Cal.4th 449, 485 (*Thomas*).)

### a. Slide Four

Slide four listed some of the predicate offenses enumerated in section 186.22, subdivision (e) as well as a picture of what Ramirez's trial counsel described as "guns,

43

drugs, cash, [and] more drugs ... ."  The court overruled defendants' Evidence Code section 352 objection, reasoning that the slide was generic, the list of offenses was accurate, and the picture was "relatively small."

Mendoza argues that the slide "suggested that appellant and his co-defendants may have committed rapes, tortures, or kidnappings" and that it implied defendants "were involved in a lifestyle of guns, drugs, and cash."  There is no evidence that the prosecutor spent any significant amount of time discussing this slide or that he or the gang expert made any statements that would connect defendants with the content of the slide.  The trial court did not abuse its discretion.

### b. Slide 10

Slide 10 had the heading " 'Norteño' " and showed pictures of people making what the prosecutor stated were Norteño gang hand signs.  The trial court overruled objections by Ramirez's counsel that the pictures had not been authenticated and that they were unduly prejudicial.  The court obtained Gridley's assurance that slide 10 was the only slide demonstrating gang signs, and the detective later testified before the jury that the use of gang hand signs is one indicator of gang membership.

Because there was no evidence that the defendants used gang signs on the date of the homicide, the slide was irrelevant and should not have been admitted.  However, the error was not prejudicial.  The slide was one of several shown during Gridley's testimony, and the prosecutor did not place any special emphasis on slide 10.  The remainder of Gridley's testimony provided ample independent evidence of Mendoza's and Ramirez's gang affiliation (including their tattoos, Mendoza's juvenile adjudication for what Gridley opined was a gang-related offense, Ramirez's close association with Barragan, and the facts of the present case).  Mendoza and Ramirez therefore have not demonstrated that it was reasonably probable that they would have obtained a more favorable result had the error not occurred.  (*People v. Partida* (2005) 37 Cal.4th 428,

44

439 ["Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test."].)

### c. Slides 40 and 41

Mendoza argues that slides 40 and 41, which contained photographs of graffiti, were unauthenticated and unduly prejudicial. At a hearing outside the presence of the jury, Ramirez's trial counsel argued that two of the four photographs in slide 40 were not authenticated because there was no testimony about "how long they have been there, where they came from, what neighborhood they are in." He raised the same objection about all of the pictures in slide 41. A person identified in the Reporter's Transcript as "The Witness" (presumably Gridley) stated that the photos "are all from the neighborhood." The trial court overruled the objections and when the prosecutor continued his direct examination of Gridley, he confirmed that two successive slides of graffiti (presumably slides 40 and 41) showed "some of the gang graffiti in this area of [Richdale] and Ezie Street ... ." Mendoza's argument on appeal that the "officer did not know what neighborhood the photographs on slide no. 40 came from" is contradicted by the foregoing testimony from Gridley that the graffiti photographs were taken in the area of the homicide.

Mendoza contends that Gridley "did not know who painted the graffiti or when the graffiti was painted." As the purpose of the photographs was to support Gridley's expert opinion that the area surrounding the scene of the homicide was claimed by a Norteño subset, the photographs were relevant and admissible without testimony regarding who painted the graffiti or the length of time the graffiti was present in the area. The absence of testimony about those characteristics merely affected the weight of the photographic evidence and factored into the court's Evidence Code section 352 determination. The trial court could reasonably conclude that any prejudice from the jury seeing photographs that might not be directly related to defendants' actions did not substantially outweigh the

45

photographs' probative value in supporting Gridley's opinion that the area around the homicide was claimed by a Norteño subset.

## E. DEFENDANTS' STATEMENTS

### 1. Mendoza's Statements at the Non-Custodial Interview

Mendoza argues that the court abused its discretion by admitting his March 2012 non-custodial interview into evidence and by allowing Detective Newton to testify about statements Mendoza made during that interview. He contends that his statements "did not provide any evidentiary value" and were unduly prejudicial. (Evid. Code, §§ 210, 350, 352.) A trial court's decisions that evidence is relevant and that its probative value is not substantially outweighed by the probability of undue prejudice are reviewed for abuse of discretion. (*People v. Kelly* (1992) 1 Cal.4th 495, 523 (*Kelly*); *Thomas*, *supra*, 51 Cal.4th at p 485.)

Mendoza fails to demonstrate that the trial court abused its discretion in finding his statements relevant. Mendoza made statements at the interview that were relevant and admissible as party admissions (Evid. Code, § 1220), including that he claimed "Northern" and that he admitted having a juvenile adjudication for robbery. Mendoza also made statements that were relevant to show a consciousness of guilt, including that he denied visiting Ezie Street, denied being in a gang, and denied knowing the other homicide suspects. The prosecutor provided other evidence (including Tommy's testimony about Mendoza's presence and Gridley's opinion about Mendoza's gang membership) that suggested Mendoza's denials were false. (Cf. *People v. Kimble* (1988) 44 Cal.3d 480, 496 ["[A]s a general rule, false statements made by a defendant at the time of arrest are admissible—not for the truth of the statements—but to show consciousness of guilt."].)

We likewise see no abuse of discretion in the trial court's decision to overrule Mendoza's Evidence Code section 352 objection. Mendoza's admission that he claimed "Northern" was highly probative of whether he was a gang member. Mendoza's denials

46

of involvement in the homicide had probative value both in supporting his defense case and in supporting the prosecutor's theory that his statements showed a consciousness of guilt. Either way, they had probative value. Nothing in his statements was so prejudicial as to compel the conclusion that the trial court abused its discretion when it decided that the statements' probative value was not substantially outweighed by the danger of undue prejudice. (Evid. Code, § 352.)

### 2. Mendoza's Booking Interview Statement

Mendoza argues that the trial court erred in admitting testimony from correctional officer Rios that Mendoza "admitted Northerner" during a classification interview at the county jail after his arrest. In *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde*), the Supreme Court determined that questions about gang affiliation during a jail classification booking interview are reasonably likely to elicit incriminating responses, making the interview a custodial interrogation under the Fifth Amendment. (*Elizalde*, at pp. 527, 541; U.S. Const., 5th Amend.) As a custodial interrogation, the *Elizalde* court found that answers to such questions are inadmissible in the prosecution's case-in-chief unless preceded by a *Miranda* advisement. (*Elizalde*, at pp. 527, 541.)

Mendoza received no *Miranda* advisement before being questioned at booking. The trial court thus erred in allowing correctional officer Rios to testify about Mendoza's statements during the booking interview.

"The erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the beyond a reasonable doubt standard of *Chapman* ... ." (*Elizalde*, *supra*, 61 Cal.4th at p. 542.) The jury had already heard that Mendoza had claimed to be "Northern" during the non-custodial interview he had with Officer Newton. Gridley opined that Mendoza was an active Norteño gang member, based on his tattoos, a juvenile adjudication, and the facts of the present case. Because other admissible evidence (including an admission by Mendoza himself) suggested that

47

Mendoza was a Norteño gang member, the trial court's erroneous admission of Mendoza's booking statement was harmless beyond a reasonable doubt.

### 3. Text Messages Sent from Mendoza's Phone

Mendoza argues that the trial court erred in admitting text messages sent from Mendoza's cellular phone because they were irrelevant and unduly prejudicial. (Evid. Code, §§ 350, 352.)  We review the trial court's decision for abuse of discretion. (*Kelly*, *supra*, 1 Cal.4th at p. 523; *Thomas*, *supra*, 51 Cal.4th at p. 485.)

### a. Background

People's Exhibit 21 (Mendoza's phone records) includes just over 20 text messages sent from or received by the phone.  Some of those text messages reference "pills" and "bud ... ."

Gridley indicated multiple times during his testimony that he based his opinions about whether individuals were gang members on the totality of the circumstances.  The detective agreed with the prosecutor that selling controlled substances is one of the enumerated crimes that can be used to validate a criminal street gang.  (See § 186.22, subd. (e)(4).)  He also agreed that it is common for gang members to support themselves by selling drugs.  Gridley stated that some of Ramirez's text messages were consistent with drug dealing.  The prosecutor asked him whether "that's consistent with being a gang member," to which Gridley responded:  "Well, I mean, I think it depends on the gang member.  [¶]...[¶]  But, yes, selling drugs is something that gang members do."

During cross-examination, Mendoza's attorney had the following exchange with Gridley:  "[Mendoza's counsel:] All right.  Now, [the prosecutor] showed you yesterday some text messages that were from a phone that was attributed to Marcos Mendoza, and it was some text messages about drug sales.  Did it appear to you that it was minor drug sales? [¶] [Gridley:] It appeared to me to be marijuana. [¶] [Mendoza's counsel:] As far as this case goes, do you see these text messages as very important to the case? [¶] [Gridley:] As far as establishing the homicide of the victim and the assault, no. [¶]

48

[Mendoza's counsel:] What about as far as in forming your opinion about his gang membership? [¶] [Gridley:] No, I wouldn't -- even though a lot of gang members sell drugs, it's not a stand-alone criteria that I would use. [¶] [Mendoza's counsel:] And, in fact, in these text messages, there is absolutely no information that would associate Mr. Mendoza with gang type of activity at all? [¶] [Gridley:] Not that I found." Mendoza's counsel asked: "So, just to be clear, you would not say that the text messages indicate any gang-related activity?" Gridley responded: "Correct."

The court overruled Mendoza's relevance and Evidence Code section 352 objections, finding that drug dealing is an enumerated section 186.22 offense, Gridley testified that his opinions were based on the totality of the circumstances (including the text messages), and the "relatively innocuous" nature of the messages meant that the "prejudice is minimal."

### b. Analysis

Mendoza does not provide the content of the messages to which he objects on appeal. He argues generally that to the extent any of the text messages suggested that Mendoza sold drugs, they were irrelevant because Gridley did not rely on drug dealing to form his opinion about Mendoza's gang affiliation.

Gridley testified that it is common for gang members to sell drugs, noted that drug-dealing is one enumerated crime relevant to establishing a pattern of criminal gang activity (§ 186.22, subd. (e)(4)), and opined that Mendoza was a gang member. Based on that testimony, evidence of drug dealing in text messages from Mendoza's phone was relevant to the jury's resolution of the case. Mendoza's trial counsel effectively cross-examined Gridley, with Gridley agreeing with counsel that the text messages were not "very important" to establishing Mendoza's gang membership and that drug dealing was "not a stand-alone criteria that I would use." But Gridley never testified that evidence of drug dealing in text messages was wholly irrelevant to his opinion; his cross-examination testimony merely affected the weight of the text message evidence.

49

As for Mendoza's Evidence Code section 352 argument, the messages were relatively innocuous and were confined to five heavily redacted pages from among over 300 pages of phone records in a trial with a voluminous record. Mendoza has not shown that the trial court abused its discretion in finding that the risk of undue prejudice did not substantially outweigh the evidence's probative value.

### 4. Text Messages Received on Mendoza's Phone

Mendoza argues, based on his trial counsel's argument at a hearing, that two messages received on Mendoza's cellular phone should have been excluded as hearsay. We review the trial court's evidentiary decision for abuse of discretion.[21] (*People v. Pirwani* (2004) 119 Cal.App.4th 770, 787.)

Our review of People's Exhibit 21 does not disclose the first message trial counsel paraphrased as saying "only call him if they are calling him." Because defendant has not shown that the foregoing message was part of the exhibit provided to the jury, we do not address his appellate argument related to it.

The exhibit contains the other message Mendoza challenged in the trial court, which was received by Mendoza's phone and reads: "Dont give tht number out to eneone cuz. He only wnts s0certain ppl to have tht only u me n marty n cholo have tht shit, just so u kno bro, gracias." (Errors in original.) The prosecutor did not respond to the hearsay objection, and the trial court implicitly overruled the hearsay objection by admitting the evidence. (*Sorenson v. Superior Court* (2013) 219 Cal.App.4th 409, 449 ["Although the court did not rule on the objection, we infer from its reliance upon the [evidence] that it implicitly overruled the objection."]; see *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 407.)

---

[21] Contrary to the People's argument on appeal, Mendoza's trial counsel preserved the hearsay objection by arguing that the messages received by Mendoza were "hearsay. There is no exception. The expert did not rely on the hearsay, so there is further no exception to that rule."

The message received on Mendoza's phone was an out-of-court statement. But the trial court could reasonably conclude that the message was not hearsay because it was not offered to prove the truth of any matters asserted. (Evid. Code, § 1200, subd. (a).) The person referred to as "He" in the message was not identified, nor was there any testimony or argument that the unidentified person indeed only wanted certain people to have access to the number the message refers to. The court could have admitted the message for the non-truth purpose of connecting Mendoza with people named Marty and Cholo, who could be Barragan's brothers (based on Tommy's testimony at trial). We see no abuse of discretion.

### 5. Ramirez Forfeited Objections to His Statements

Ramirez joins Mendoza's appellate arguments about Mendoza's statements to police and text messages. (Cal. Rules of Court, rules 8.200(a)(5) ["[A] party may join in or adopt by reference all or part of a brief in the same or a related appeal."]; 8.360(a).) Ramirez also appears to argue that the trial court erred in admitting Ramirez's statements to police and text messages because the parts of Mendoza's brief that he joins apply "equally to Mr. Ramirez's denials of guilt and text messages." But Ramirez provides no analysis to challenge the trial court's decision regarding Ramirez's statements.

A party challenging the admission of evidence must, at the very least, describe the evidence being challenged and explain why the trial court erred in admitting it. Even if the evidence Ramirez challenges falls into the same broad categories as the evidence Mendoza challenges (i.e., statements to police and text messages), a trial court's decision whether to admit evidence is necessarily evidence-specific. As Ramirez fails to provide reasoned argument to support his claim on appeal, he has forfeited his appellate argument related to admission of his statements at trial. (*Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066 ["When an appellant asserts a point but fails to support it with reasoned argument and citations to authority, we treat the point as forfeited."].)

51

## F. EVIDENCE CORROBORATING TOMMY'S TESTIMONY ABOUT MENDOZA

Mendoza argues that there was insufficient evidence of his involvement in the homicide to corroborate Tommy's accomplice testimony. (Citing § 1111.)

"A conviction can not [*sic*] be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense ... ." (§ 1111.) But corroboration can come from circumstantial evidence that would be of limited weight if standing alone, so long as it tends to "implicate the defendant by relating to an act that is an element of the crime." (*People v. McDermott* (2002) 28 Cal.4th 946, 986 (*McDermott*).) The prosecutor is not required to present corroborating evidence establishing every element of the crime, but the corroborating evidence must, "without aid from the accomplice's testimony, tend to connect the defendant with the crime." (*Ibid.*) We are bound by the jury's decision "unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime." (*Ibid.*)

Tommy testified that Mendoza was at 436 Ezie St. the night of the homicide; that Mendoza was punching the victim during the attack; that Mendoza fled with Tommy and the others; and that Mendoza stated while in the car that " 'I booked him' ... ." Tommy also suggested that Mendoza accompanied Tommy and the others to Deleone's house, Barragan's mother's house, and Milpitas after the homicide.[22]

As for corroborating evidence, Raymond Jr. responded "I think so" when asked at trial whether Mendoza was at 436 Ezie St. on the night of the homicide. Mendoza's fingerprints matched those on a beer can recovered from the back yard at 436 Ezie St. and his fingerprints and DNA were recovered from a can in the house's front driveway.

---

[22] Tommy did not explicitly mention Mendoza's name every time he testified about the next destination of their flight, but also never testified that Mendoza left the group. Tommy also stated that Creeper picked up "[a]ll of us except David [Martell]" from Barragan's mother's house in order to drive them to Milpitas.

Calls from a cellular phone associated with Mendoza connected through towers in the vicinity of the crime scene around the time of the crime (around 10:00 p.m.), through a tower closer to Deleone's house closer to 11:00 p.m., through a tower near Barragan's mother's house after 11:00 p.m., and through a tower in Milpitas shortly after 2:00 a.m. Rivas testified that everyone who ran from 436 Ezie St. participated in the assault.

The corroborating evidence supported findings that Mendoza was at 436 Ezie St. around the time of the homicide, that he participated in the assault on Garcia (if the jury believed he was one of the people who left 436 Ezie St. to chase Garcia), and that he fled the scene of the crime with the other assailants. The corroborating evidence sufficiently tended to connect Mendoza to the homicide.

Mendoza relies on *People v. Pedroza* (2014) 231 Cal.App.4th 635 (*Pedroza*). In *Pedroza*, an accomplice testified that he heard two gun shots, turned and saw Pedroza with a revolver pointed at the victim, and then saw a third person (Garivay) shoot the victim twice with a shotgun. (*Id.* at p. 640.) Pedroza, Garivay, and the accomplice drove to Garivay's house (20 minutes away from the crime scene) where Garivay's girlfriend Lisa also lived. (*Id.* at pp. 639–640.)

On appeal from the trial court's acquittal of Pedroza based on its finding that there was insufficient corroboration as a matter of law, the Court of Appeal summarized the corroborating evidence connecting Pedroza to the murder charge as follows: "(1) [Pedroza] was in the same gang as the victim and [the accomplice]; (2) the gang— which had over 400 members—was experiencing frequent in-house murders; and (3) at some time after 11:00 p.m., Lisa heard a banging noise at her house; a few hours later, between 2:00 and 3:00 a.m., she saw [Pedroza] in her garage, along with Garivay, [the accomplice], and Renteria." (*Pedroza*, *supra*, 231 Cal.App.4th at pp. 643, 647, 651.) The Court of Appeal found that the corroborating evidence showed nothing more than a general connection to the victim and other perpetrators and that there was no evidence

53

about Pedroza's acts or conduct, "except that he was with at least one admitted perpetrator, hours *after* the crime." (*Id.* at p. 651, italics in original.)

*Pedroza* is distinguishable because the only corroborating evidence in that case came from someone who was nowhere near the scene of the crime and who only saw the defendant hours after the crime was committed. By contrast, the corroborating evidence in this case supported findings that Mendoza was at the scene of the crime when the crime took place, participated in the assault, and fled with the other perpetrators.

## G. INTIMIDATION EVIDENCE

Defendants argue the trial court erred in denying their motion in limine to exclude intimidation evidence related to Rivas, Tommy, and Deleone as unduly prejudicial. (Evid. Code, § 352.) We review the trial court's decision for abuse of discretion. (*Thomas*, *supra*, 51 Cal.4th at p. 485.)

### 1. Background

The trial court denied defendants' motion in limine to exclude intimidation evidence and invited counsel to make specific objections during trial. Rivas testified that his home was vandalized within hours after he received a subpoena to testify at defendants' trial and that he remained fearful at the time of trial. Tommy testified that Barragan's brother made statements about Raymond Jr. and Raymond III "snitching," which made Tommy fearful for both his and his family's safety. Deleone testified that he was attacked while in county jail and was told that the attack had been ordered by Norteños because he had made statements to the police about defendants' case. Deleone testified that he became somewhat fearful after the attack and had requested that the district attorney's office escort him to and from his testimony at defendants' trial.

The court instructed the jury before deliberations: "A witness or witnesses have testified regarding threats made by someone other than the defendants. Evidence of third-party threats is relevant only as to the witness' state of mind, attitude, actions, bias

54

and prejudice. Do not consider this evidence for any other purpose. Such evidence may not be used to infer direct, or consciousness of, guilt on the part of defendants."

### 2. Analysis

"[E]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to that witness's credibility ([citations]), and may be admissible whether or not the threat is directly linked to the defendant ... ." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1087 (*Mendoza*); Evid. Code, § 780.) Each of the three witnesses testified to receiving threats that they perceived were related to their involvement in defendants' trial, and each testified that those threats made them fearful. The evidence was probative of their state of mind and credibility. (*Mendoza, supra,* 52 Cal.4th at p. 1087.) The trial court reduced the risk of prejudice related to the statements by providing a limiting instruction directing the jury not to use the evidence "to infer direct, or consciousness of, guilt on the part of defendants." We presume the jury followed that instruction. (*Boyette*, *supra*, 29 Cal.4th at p. 453.) Because the evidence had probative value and the trial court properly limited the purposes for which the evidence could be considered, we find no abuse of discretion in the trial court's decision that the probative value of the evidence was not substantially outweighed by its risk of undue prejudice.

### H. JURY INSTRUCTIONS

Defendants argue the trial court improperly instructed the jury regarding the mental state necessary to convict defendants for aiding and abetting assault or murder; the extent to which the defendants' voluntary intoxication could be considered; and the definition of a criminal street gang.[23] We review defendants' argument on appeal despite their failure to object at trial because " '[w]hether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim' ... ." (*People v. Ngo* (2014) 225 Cal.App.4th 126, 149; § 1259 ["The appellate

---

[23] Mendoza originally claimed an additional instructional error (related to CALCRIM No. 400) in his Opening Brief but withdrew the argument in his Reply Brief.

55

court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."].)

## 1. Standard of Review

"No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, ... unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) We review claims that a trial court has misdirected a jury de novo. If the challenged instruction is ambiguous, we independently review whether there is a "reasonable likelihood that the jury construed or applied the challenged instructions in a manner" contrary to law. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1077, overruled on another ground by *Hill*, *supra,* 17 Cal.4th at p. 823, fn. 1.) In reviewing whether the trial court properly instructed the jury, we consider " 'the entire charge of the court' " rather than focusing on only parts of an instruction. (*People v. Carrington* (2009) 47 Cal.4th 145, 192 (*Carrington*).)

## 2. Mens Rea for Aiding and Abetting Liability

### a. Mens Rea Instructions

The jury was instructed as follows.[24] CALCRIM No. 252 provided that the "following crime and allegation requires a specific intent or mental state: Murder as charged in Count 1 and the gang enhancement." The instruction explained that to find a defendant guilty the jury must find not only that the defendant "intentionally commit[ted] the prohibited act" but also that he did so "with a specific intent and/or mental state," as "explained in the instruction for that crime or allegation." CALCRIM No. 252 provided that the lesser included offenses of voluntary manslaughter and involuntary manslaughter require only general criminal intent.

---

[24] As the written instructions do not materially differ from the oral pronouncement, we quote the instructions as they appear in the Clerk's Transcript.

56

CALCRIM No. 400 provided that the jury may find a defendant guilty of a crime in two ways, either by finding that the defendant "directly committed the crime" or by finding that the defendant "aided and abetted a perpetrator, who directly committed the crime." CALCRIM No. 401 defined the elements of aiding and abetting liability and also states that someone "aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

CALCRIM No. 403 provided, in relevant part: "Before you may decide whether the defendant is guilty of murder, you must decide whether he is guilty of assault or assault with force likely to cause great bodily injury. [¶] To prove that the defendant is guilty of murder, the People must prove that: [¶] 1. The defendant is guilty of assault or assault with force likely to cause great bodily injury; [¶] 2. During the commission of the assault or assault with force likely to cause great bodily injury a co-participant in that assault or assault with force likely to cause great bodily injury committed the crime of murder; [¶] and [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the assault or assault with force likely to cause great bodily injury. [¶] ... [¶] The People are alleging that the defendant originally intended to aid and abet assault or assault with force likely to cause great bodily injury. [¶] If you decide that the defendant aided and abetted one of these crimes and that murder was a natural and probable consequence of that crime, the defendant is guilty of murder. You do not need to agree about which of these crimes the defendant aided and abetted." (Capitalization omitted.)

CALCRIM Nos. 915 and 875 defined assault and assault with force likely to cause great bodily injury, respectively, and informed the jury that to find a defendant committed one of those crimes, "[i]t is not required that [the defendant] intend[ed] to

57

break the law, hurt someone else, or gain any advantage." Those instructions also state that "[v]oluntary intoxication is not a defense to assault."

### b. Mens Rea Instructions Were Adequate

Defendants argue that the combination of the foregoing instructions caused the jury to be "advised that no 'specific intent' need be proven for guilt to arise as to assault for [an] aider and abettor." Ramirez states in his Opening Brief that "[a]s will be shown, CALCRIM 401 did not save the day" but then proceeds to his argument about voluntary intoxication without explaining why CALCRIM No. 401 did not adequately instruct the jury regarding the mens rea necessary to convict defendants as aiders and abettors.

Defendants' argument appears to be that, (1) CALCRIM No. 252 purportedly informed the jury that specific intent need only be shown for murder and the gang enhancement; (2) specific intent is necessary to be convicted for aiding and abetting; (3) CALCRIM Nos. 915 and 875 informed the jury that assault and assault with force likely to cause great bodily injury do not require specific intent; (4) CALCRIM No. 403, which stated that the prosecutor's theory of the case was that defendants intended to aid and abet an assault or assault with force likely to cause great bodily injury, did not repeat the statement from CALCRIM No. 401 that specific intent is required for aider and abettor liability; and (5) that failure to repeat the specific intent mental state left the jury with the impression that specific intent did not need to be shown to find defendants guilty of murder based on aiding and abetting assault (the natural and probable consequence of which was murder).

We disagree with defendants' first premise and their conclusion. CALCRIM No. 252 stated that murder and the gang enhancement "requires a specific intent or mental state" but did not instruct the jury that those were the *only* issues in the case requiring specific intent. That instruction merely informed the jury that the only substantive count charged in the case (murder) was a specific intent crime and that lesser included offenses related to that count (voluntary and involuntary manslaughter) were

58

general intent crimes. The jury was also not misinstructed by the court's failure to repeat the mens rea necessary for aider and abettor liability in CALCRIM No. 403. The trial court explicitly stated that specific intent was necessary for aider and abettor liability in CALCRIM No. 401 immediately before providing CALCRIM No. 403. When read in the context of the instructions as a whole, we find no reasonable likelihood that the instructions caused the jury to misapply the law. (*Carrington*, *supra*, 47 Cal.4th at p. 192.)

### 3. Voluntary Intoxication Instruction

Defendants argue that the voluntary intoxication instruction provided to the jury improperly limited the issues about which the jury could consider evidence of defendants' voluntary intoxication. "[T]he intent requirement for aiding and abetting liability is a 'required specific intent' for which evidence of voluntary intoxication is admissible" under section 29.4, subdivision (b). (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1131; § 29.4, subd. (b) ["Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent ... ."].)

The jury was instructed: "You may consider evidence, if any, of a defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the specific intent to kill or to promote, further, and assist in criminal conduct by gang members or a mental state such as premeditation. [¶] ... [¶] Do not consider evidence of intoxication in deciding whether murder was a natural and probable consequence of assault or assault with force likely to cause great bodily injury. [¶] In connection with the charge of murder the People have the burden of proving beyond a reasonable doubt that the defendant acted with the requisite specific intent or mental state required. If the People have not met this burden, you must find the defendant not guilty of murder. [¶] ... [¶] You may not consider evidence of voluntary intoxication for any other purpose." (Capitalization omitted.)

59

Contrary to defendants' argument, the foregoing instruction informed the jurors that they could consider evidence of defendants' voluntary intoxication in deciding three things: (1) intent to kill; (2) intent to promote, further, and assist in gang conduct; or (3) regarding "a mental state such as premeditation." It also specifically stated that the People had the burden to prove that defendants "acted with the requisite intent or mental state required" to convict one or all of them of "the *charge* of Murder ... ." (Italics added.) The prosecutor's theory was that defendants were guilty of murder by aiding and abetting an assault. As aiding and abetting liability was only relevant to whether defendants were guilty of the murder charge, we find that reasonable jurors would have understood their freedom to consider voluntary intoxication when deciding whether defendants formed the specific intent necessary to convict them of murder under an aiding and abetting theory.

### 4. Section 186.22 Instruction

Defendants argue that, in light of the Supreme Court's decision in *Prunty*, the trial court erred by not instructing the jury about the " 'associational or organizational connection' " and " 'sameness' " requirements necessary to support the gang enhancement. (Quoting *Prunty*, *supra*, 62 Cal.4th at p. 71, italics omitted.)

The trial court read the jury a version of CALCRIM No. 1401, which provided the elements of the section 186.22, subdivision (b) gang enhancement and also defined the phrases " 'criminal street gang' " and " 'pattern of criminal gang activity' " by paraphrasing section 186.22, subdivisions (f) and (e), respectively.

#### a. Legal Background and *Prunty*

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) Among other things, that sua sponte duty includes instructing the jury regarding the elements of special allegations like the section 186.22, subdivision (b) enhancements alleged here. (*People v.*

60

*Mil* (2012) 53 Cal.4th 400, 409.) That duty is generally satisfied by providing an instruction that tracks the language of the statute defining the enhancement at issue, especially if "the jury would have no difficulty in understanding the statute without guidance ... ." (*People v. Poggi* (1988) 45 Cal.3d 306, 327.) When "a phrase 'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.' " (*People v. Rowland* (1992) 4 Cal.4th 238, 270–271.)

In *Prunty*, the Supreme Court interpreted "organization, association, or group, ... whether formal or informal," as used in section 186.22, subdivision (f) to "contemplate some kind of relationship, or degree of 'togetherness,' uniting those individuals." (*Prunty, supra,* 62 Cal.4th at p. 72.) The court's decision was based on the common understanding of those terms, as shown by the Supreme Court's reliance on dictionary definitions to support its reasoning. The *Prunty* court rejected the argument that it was adding " 'an element to the statute that the Legislature did not put there.' " (*Id.* at p. 76, fn. 4.) The court clarified that it was merely interpreting the words of section 186.22. (*Ibid.*)

### b. Analysis

Defendants do not explain how the trial court could have a duty to instruct the jury sua sponte about a case that would not be decided by the California Supreme Court until two years after the trial ended. Even if it would be possible to impose such a duty, defendants' argument here is without merit. Defense counsel did not seek clarification of the phrase "ongoing, association, or group ... , whether formal or informal," as used in section 186.22, subdivision (f) and in the version of CALCRIM No. 1401 provided to the jury. The trial court provided an instruction that tracked the language of section 186.22, subdivisions (b), (e), and (f), thereby providing the jury the elements of the gang enhancement. The organizational association discussed in *Prunty* is not a separate

61

statutory element of the enhancement but rather a judicial interpretation of the "ongoing organization, association, or group" language used in section 186.22, subdivision (f). (*Prunty, supra,* 62 Cal.4th at p. 71.) Further, the *Prunty* court's discussion demonstrates that the phrase in section 186.22, subdivision (f) does not have a technical meaning different from its commonly understood meaning. Because the trial court instructed the jury about all elements of the gang enhancement, defendants' instructional error claim fails.

## I. EVIDENCE SUPPORTING MARTELL'S MURDER CONVICTION

Martell argues there was insufficient evidence to support his second degree murder conviction. As stated above, "we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Bolin, supra,* 18 Cal.4th at p. 331.)

Based on the instructions the jury received, we assume the jury found Martell guilty of second degree murder under the natural and probable consequences doctrine based on the following implicit findings: Martell personally assaulted Garcia; Martell aided and abetted Mendoza and Ramirez (and possibly others) in their assault of Garcia; one or more of the perpetrators to that assault murdered Garcia; and a reasonable person in Martell's position would have or should have known that murder was a reasonably foreseeable consequence of the group assault.

### 1. Rivas's Credibility was a Question for the Jury

Martell argues that Rivas's testimony about what he could see the night of the homicide was not credible as a matter of law and that, without Rivas's testimony, there was insufficient evidence that Martell committed any crime (either directly or as an aider or abettor).

### a. Background

Rivas testified that five to seven men came from the direction of 436 Ezie St., chased Garcia, and knocked him down. Those men "were all participating" in the assault that followed, which included mostly kicking but also some punching. Rivas acknowledged that it was not very light outside that night, that there were no streetlights near the victim's location on Richdale, and that his vantage point in the garage was about 60 yards from the victim. A defense investigator testified that the distance between Rivas and the victim was around 66 yards and that, based on information from the Internet, there would have been almost no light coming from the moon on the night of the homicide. Martell's trial counsel did not elicit testimony from any witness (expert or otherwise) regarding how well one might be able to see an assault occurring under similar circumstances as those experienced by Rivas.

### b. Analysis

Contrary to Martell's argument, Rivas's credibility as an eyewitness was a quintessential jury question. Rivas testified about what he saw that night and acknowledged factors (including distance and lighting) that might affect how the jury would weigh his testimony. Attorneys for Martell and Ramirez cross-examined Rivas at length about the lighting conditions and distance from which he witnessed the homicide.

It is not unreasonable as a matter of law that someone could see whether a group of five to seven men were all participating in an assault occurring about 60 yards from the eyewitness despite poor lighting conditions. The defense provided no expert testimony to call into question Rivas's ability to see under those circumstances, much less testimony that could discredit Rivas's account as a matter of law. Martell cannot discredit Rivas's testimony by simply labeling it an "improbable and extraordinary visual feat" on appeal. The jury was free to weigh Rivas's credibility and decide whether his testimony should be credited. Based on defendants' convictions, we infer that the jury found Rivas's

testimony credible, a finding we must defer to on appeal. (*People v. Jackson* (2014) 58 Cal.4th 724, 749.)

## 2. Evidence Supporting Aider and Abettor Liability

Based largely on his argument about Rivas's credibility, Martell argues there was insufficient evidence to convict him of aiding and abetting the assault on Garcia. "[P]roof of aider and abettor liability requires proof in three distinct areas:  (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus— conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225 (*Perez*); § 31 ["All persons concerned in the commission of a crime ... , whether they directly commit the act constituting the offense, or aid and abet in its commission ... , are principals in any crime so committed."].)

There was ample evidence that a perpetrator assaulted Garcia, including Tommy's testimony that Ramirez and Mendoza punched Garcia; Mendoza's hearsay statement to Tommy that he " 'booked' " Garcia 14 or 15 times; and Dr. O'Hara's testimony that Garcia received numerous stab wounds, lacerations, and blunt-force trauma.

There was also evidence showing that Martell assisted in the attack by personally assaulting Garcia.  Martell "concede[s] here that Martell was not only drinking with the other co-defendants that evening, but also went with them to the vicinity where the homicide took place."  Rivas testified that the people who ran from 436 Ezie St. (a group that Martell now concedes he was a part of) "were all participating" in the assault on Garcia.  Detective Vallejo testified that when he interrogated Martell four days after the assault, Martell had scratches or abrasions on his hands.  And Tommy testified that Martell left the scene of the homicide with the other defendants.  Though the foregoing evidence was challenged by calling into question Rivas's ability to see and by offering an

64

innocent explanation for the scratches on Martell's hands (that he had sustained the injuries at work), those challenges were only to the weight of the evidence. A reasonable trier of fact could have found that Martell assisted the other defendants by personally assaulting Garcia. (*Bolin*, *supra*, 18 Cal.4th at p. 331.)

As for Martell's mens rea, the prosecutor had to show not only Martell's knowledge of the perpetrators' unlawful intent but also Martell's intent to assist the perpetrators. (*Perez*, *supra*, 35 Cal.4th at p. 1225.) The evidence supported a finding that Martell was present and directly participated in the assault. Based on that evidence, the jury could find both that Martell had knowledge of the other perpetrators' intent (because he could see them assaulting Garcia), and that Martell intended to assist those other perpetrators by actively assaulting Garcia.

Martell's arguments to the contrary all go to the weight of the evidence rather than to its sufficiency to support a conviction. Martell argues that Rivas "never testified as to when he heard" the perpetrators yell, meaning those statements could not support a finding that Martell knew of the perpetrators' intent. But the jury could reasonably infer that whoever yelled " 'Get him' " would do so *before* assaulting Garcia, thus supporting a finding that Martell became apprised of the perpetrators' intent in advance. Martell also argues that he was intoxicated, which he deems "important in evaluating the motive of [an] intoxicated 20-year-old following others [to] where the homicide eventually occurred." But, as already discussed, the jury was properly instructed regarding voluntary intoxication and its decision to convict Martell supports an inference that the jury determined that voluntary intoxication did not negate Martell's specific intent to aid and abet.

### 3. Evidence Supporting Martell's Murder Conviction

Martell argues that even if there was sufficient evidence that he assaulted Garcia and aided and abetted the other perpetrators' assault, the evidence was nonetheless insufficient to show that murder was a natural and probable consequence of the assault.

" 'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime.' " (*Medina*, *supra*, 46 Cal.4th at p. 920, brackets in *Medina*.)  A nontarget offense is a natural and probable consequence of the target offense if a reasonable person in the defendant's position should have known that the charged offense was a reasonably foreseeable consequence of the intended crime the defendant aided and abetted.  (*Ibid.*) Whether the charged offense was a reasonably foreseeable consequence "is a factual issue to be resolved by the jury." (*Ibid.*)

Tommy testified that he, Barragan, Martell, Mendoza, and Ramirez all ran toward Garcia, and Rivas testified that everyone in the group who ran after Garcia participated in the assault by punching or kicking Garcia.  Based on that evidence, a jury could reasonably conclude that a reasonable person in Martell's position should have known that Garcia's death would be a foreseeable consequence of five men assaulting one victim.

## J.  EFFECTIVENESS OF MARTELL'S TRIAL COUNSEL

Martell argues that his trial counsel provided ineffective assistance by failing to raise a defense theory and by failing to adequately cross-examine Rivas.

To establish ineffectiveness of trial counsel in violation of a defendant's right to counsel under the Sixth Amendment to the United States Constitution, a defendant must show both that counsel's performance was deficient and that he was prejudiced by the deficiency.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 216–217 (*Ledesma*).)  Deficient performance is rarely shown if there was a tactical reason for trial counsel's conduct. (See *People v. Cruz* (1980) 26 Cal.3d 233, 255–256 ["except in rare cases, an appellate court should not attempt to second-guess trial counsel as to tactics"]; *Bolin*, *supra*, 18 Cal.4th at p. 317 [affirming conviction when alleged failure to object "may well have been 'an informed tactical choice within the range of reasonable competence' "].)  To

prove prejudice, a defendant must affirmatively show a reasonable probability that, but for his trial counsel's errors, the result would have been different.  (*Ledesma*, at pp. 217–218.)

### 1.  Counsel Was Not Ineffective During Closing Argument

Martell argues that the theory of the case his trial counsel argued to the jury—that Martell drank a beer at 436 Ezie St. but left the area before the homicide—was not plausible and that he should have instead argued that Martell was present at the scene of the homicide but did not aid and abet any crime.  Alternatively, Martell argues that his trial counsel should have at least presented both theories to the jury.

### a.  Trial Counsel's Theory Was Plausible

Martell's trial counsel acknowledged that Martell's DNA and fingerprints were found on one cigarette and one beer can, respectively, at 436 Ezie St.  Based on that evidence, trial counsel argued Martell came to the house for one beer and then left.  Trial counsel noted that Tommy was the only person who testified that Martell was at the scene of the crime, and trial counsel read the jury parts of CALCRIM No. 335, which instructed the jury to view Tommy's accomplice testimony with caution.  Trial counsel argued that Martell lied to the police about not visiting Ezie Street on the night of the homicide because Martell knew " 'snitches get stitches,' " "[y]ou've looked at what happened to Mr. Deleone," and "you can imagine what it would be [like] out on the street for Mr. Martell having been involved in gang activity and now being labeled a snitch."  And counsel argued that it was "certainly a possibility" that Martell dropped his cellular phone in the vicinity of the homicide area when he walked to 436 Ezie St. from where he had been dropped off earlier, or when he walked away from the house before the homicide occurred.

On appeal, Martell argues that the foregoing theory was implausible and that his theory on appeal—that he was present at the scene of the homicide but did not aid and abet any crime—was better supported by the evidence.  But both theories have significant

weaknesses.  Martell's preferred appellate theory was inconsistent with Rivas's testimony that everyone who approached Garcia participated in the assault.  His appellate theory would have also required trial counsel to make the complicated argument that while Martell was present at the scene of the homicide, the jurors should not construe any action he took there as assisting the perpetrators.  Given the number of ways conduct can be found to aid and abet a crime ("aid, facilitate, promote, encourage, or instigate the perpetrator's commission" of a crime), any theory that isolated Martell entirely from the scene of the crime would benefit his defense.

Trial counsel's argument also harmonized Martell's version of events with what Rivas saw because if Martell was not at the scene of the homicide then Rivas's testimony that everyone who was there participated would not implicate Martell.  Trial counsel's argument attempted to insulate Martell from the homicide by making the straightforward argument that he did not aid and abet any crime because he was not there when the crime occurred.  Trial counsel could have reasonably concluded that a jury would be less likely to be confused by that argument.

Martell's attack on his trial counsel's argument is unpersuasive.  He argues that his trial strategy required him to admit that Martell lied to the police.  But, as Martell acknowledges, evidence about lying to the police "was obviously not favorable evidence for any argument," and even under his appellate theory Martell would have had to admit lying to the police.  Further, trial counsel provided a plausible explanation for Martell's lies, arguing that he lied to protect himself from retaliation from the actual perpetrators.

As for the location of Martell's cellular phone, Martell contends that trial counsel's argument that Martell happened to lose his phone in the same area where the homicide later occurred "would have been extraordinarily bad luck" and was mere speculation.  But counsel provided a plausible explanation for its location by arguing that Martell would have likely walked through that area before the homicide occurred.  Trial counsel also reminded the jury that an officer had testified that the clip securing Martell's

68

phone to his pocket was loose.  While the cellular phone's location was certainly a major weakness in trial counsel's theory, providing an innocent explanation for its location allowed Martell to isolate himself from the scene of the homicide.

Trial counsel's decision about which theory to pursue also informed counsel's decision about which evidence to use and Martell does not demonstrate that trial counsel erred in choosing which evidence to present to support that theory.  Because we find that trial counsel made an informed tactical decision when selecting the theory to present to the jury, Martell has not demonstrated ineffective assistance from trial counsel.[25]

## b.  Trial Counsel's Decision Not to Argue Two Theories

Martell argues that trial counsel should have at least argued both theories to the jury and that by not arguing both theories he impliedly conceded that Martell's preferred appellate theory was not supported by the evidence.  But the two theories were contradictory.  Either Martell was not at the scene of the homicide at all (trial counsel's theory) or he was at the scene but did not participate (Martell's appellate theory).  Trial counsel could reasonably conclude that arguing both theories would risk confusing the jury or, even worse, suggest to the jury that trial counsel was not confident enough in either of the theories to rely on only one.  (See *People v. Palmer* (2005) 133 Cal.App.4th 1141, 1159 ["Counsel may have wished to concentrate on the argument he viewed as more persuasive ... rather than potentially confusing the issues and detracting from his credibility with the jury by making a nonpersuasive argument."].)

---

[25]  Trial counsel stated:  "[T]here is an old kind of a joke: how can you tell when a lawyer is lying?  When his lips are moving.  I think the same is true of the Gonzalez family.  How can you tell when the Gonzalez family is lying?  Their lips are moving."  Martell calls that analogy "a vile slur against all counsel" and appears to suggest that the jury would have found trial counsel's argument less credible as a result.  Trial counsel's intent was to attack the credibility of the Gonzalez family and not himself or the entire legal profession.

Given those risks, there was a tactical reason for trial counsel's decision to rely on but one theory.

### 2. Counsel Was Not Ineffective During Rivas's Cross-Examination

Martell argues his trial counsel was deficient for failing to impeach Rivas with two statements Rivas made during Mendoza's grand jury proceedings.

#### a. Participation in the Homicide

On direct examination at trial, Rivas responded "Yes" when asked, "Did they all participate in beating him up?" At the grand jury proceedings, the prosecutor had asked a similar question and Rivas responded: "Yes. It looked like everybody did." Martell's trial counsel did not ask Rivas about his grand jury testimony.

Counsel for Ramirez cross-examined Rivas at length at trial about what Rivas could see that night. As part of that cross-examination, counsel for Ramirez drew a diagram (with an X representing the body and the letters A through G surrounding the X) and proceeded to ask Rivas what he recalled seeing each assailant do. Rivas acknowledged that he could not testify regarding any specific assailant's actions and that "I just seen everybody swinging." Ramirez's counsel eventually asked Rivas, "Is it safe to say that ... if you had seen seven people in front of you, you couldn't tell us what each one of them did today?" to which Rivas responded, "No."

Seizing on the words "looked like" in Rivas's grand jury testimony, Martell argues on appeal that Rivas "was not certain that everyone participated" and that Martell's trial counsel was deficient for not impeaching Rivas with his grand jury testimony. But after the extensive cross-examination by Ramirez's trial counsel, Martell's trial counsel could have reasonably concluded that the issue of Rivas's ability to see the assault and his ability to recall what he saw had been adequately explored. This is especially true because Rivas's grand jury testimony was almost identical to his trial testimony. Martell's trial counsel could have also concluded based on Rivas's responses to his cross-examination by counsel for Ramirez that asking Rivas additional questions would lead to

70

further damaging statements about what Rivas saw (e.g., "I just seen everybody swinging"). Martell has not shown his trial counsel was deficient.

### b. Order of Chase

Martell argues that his trial counsel was deficient for not questioning Rivas about the order of the people chasing Garcia.

#### i. Grand Jury and Trial Testimony

Rivas testified before the grand jury that "[o]ne individual from 436 started running towards him ... [a]nd then, after he started trotting up to him, two people started running behind him," followed by three or four more. That grand jury testimony was not introduced at trial.

At trial, Rivas initially testified that one person approached Garcia from 436 Ezie St., followed by the others. Rivas testified during cross-examination by Martell that he initially saw one person approach Garcia but that when the group decided to charge Garcia "[t]here was two guys at first that were charging. One was a little bit closer than the other guy. And then after those two guys came closer to him and four more guys started rushing closer."

Tommy testified at trial that he ran toward Garcia first, followed by Martell and then the others. During closing argument, the prosecutor paraphrased Rivas's testimony about two people charging Garcia, with one slightly in front of the other. The prosecutor did not provide names for the people he thought those two people were.

#### ii. Analysis

Martell notes that Tommy testified that Martell was the closest person following Tommy as they approached Garcia. Martell argues that the prosecutor's paraphrasing of Rivas's testimony relied on Tommy's testimony and implied that Martell was the second person chasing Garcia. Martell contends that eliciting Rivas's grand jury testimony somehow "would have greatly undercut" the inference that Martell was the second person

71

"as well as casting further doubt on Rivas's ability to accurately recall what he believed he had seen."

Martell seems to suggest that Tommy's testimony should have triggered Martell's trial counsel to question Rivas about his grand jury testimony. But Tommy testified *after* Rivas. Martell does not explain how his trial counsel would have known that Tommy would implicate Martell as the person who followed Tommy most closely during the chase.

Even if Martell's trial counsel could have known what Tommy would say, Tommy's testimony could be accurate under each of the scenarios Rivas described. If one person was followed by a group of people, Martell could have been the first one in that later group. If two people initially approached Garcia, with one a little bit closer than the other, Martell could have been the second person. And if one person originally approached Garcia, followed by a group of two people, Martell could have been the first person in that group of two people. As eliciting Rivas's grand jury testimony would not have materially assisted Martell's defense, trial counsel may have had a tactical reason for not doing so.

## K. STAYING THE GANG ENHANCEMENTS

The trial court purported to stay the sentence for the section 186.22, subdivision (b) gang enhancements, citing *Johnson*, *supra*, 109 Cal.App.4th 1230. We requested supplemental briefing regarding whether section 186.22, subdivision (b)(5) requires that the abstracts of judgment be amended to note a 15-year minimum parole eligibility date. In supplemental briefing, Ramirez (joined by Mendoza and Martell) argues that we do not have "jurisdiction to add a section 186.22(b)(5) allegation where there was none below."

### 1. Background

The information alleged that defendants committed the murder for the benefit of a criminal street gang "within the meaning of Penal Code section 186.22(b)(1)(C)." The

72

verdict forms also specifically identified the enhancement as involving section 186.22, subdivision (b)(1)(C).

At sentencing, counsel for Mendoza stated: "So as we discussed in chambers -- and [the prosecutor] was kind enough to provide the citation -- the ten years would not be imposed on this case because it's a homicide case. And the cite is *People versus Johnson*, 109 Cal.App.4th 1230 at 1236–7. So I'm going to ask the Court not to impose the ten-year gang enhancement, the punishment pursuant to that statute." The court concluded that the "additional ten-year term for the enhancement pursuant to Penal Code section 186.22(b)(1)(c) is stayed pursuant to the *Johnson* case cited by counsel."

### 2. Analysis

Section 186.22, subdivision (b)(1) provides that "[e]xcept as provided in paragraphs (4) and (5)," any person convicted of committing a felony for the benefit of a criminal street gang "shall be punished" with a term that varies based on the severity of the underlying felony. Section 186.22, subdivision (b)(1)(C) states that if the underlying "felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years." However, section 186.22, subdivision (b)(5) provides, in relevant part: "any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."

In *Johnson, supra,* 109 Cal.App.4th 1230, the Court of Appeal decided that the 10-year section 186.22, subdivision (b)(1)(C) enhancement could not apply to a second-degree murder conviction because that felony conviction "is a 'felony punishable by imprisonment in the state prison for life' within the meaning of section 186.22, subdivision (b)(5)." (*Johnson,* at p. 1237.) The *Johnson* court struck the 10-year enhancement and instructed the trial court to "modify the abstract of judgment to ... note a 15-year minimum parole eligibility date on that count pursuant to section 186.22, subdivision (b)(5)." (*Johnson,* at pp. 1239–1240.)

73

Here, in response to a request from Mendoza's counsel, the trial court purported to stay the gang enhancements based on *Johnson*, and it appears the trial court intended to follow that case's holding. But the abstracts of judgment here do not contain the section 186.22, subdivision (b)(5) parole eligibility limitation discussed in *Johnson*. To effectuate the trial court's apparent intent (which, again, was based on a request from Mendoza), we will order that the abstracts of judgment be modified to note a 15-year minimum parole eligibility date.

## L. CUMULATIVE ERROR

Defendants claim that the various errors they identify are cumulatively prejudicial. "Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice." (*Hill*, *supra*, 17 Cal.4th at p. 844.) "Nevertheless, a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*Ibid.*)

We have found the following errors: (1) the prosecutor improperly continued to ask about weapons during his direct examination of Deleone; (2) the prosecutor used an improper method of refreshing Deleone's recollection; (3) the trial court admitted an irrelevant slide during the gang expert's slide show; and (4) the court improperly admitted evidence of Mendoza's statements about gang affiliation during his jail classification interview. These issues are not insignificant, but neither are they cumulatively prejudicial.

[The remainder of this opinion is to be published.]

## III.     NO RETROACTIVE APPLICATION OF PROPOSITION 57

We granted rehearing and asked the parties to submit supplemental briefing regarding whether Proposition 57 had any effect on Ramirez's appeal. Ramirez argues that he is entitled to relief under Proposition 57 because: (1) the voters intended to apply Proposition 57 to non-final cases; (2) *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) compels retroactive application of Proposition 57; and (3) the failure to apply Proposition

74

57 retroactively would violate his California and federal constitutional rights to equal protection and due process.

### A. PROCEDURAL BACKGROUND AND PROPOSITION 57

Ramirez, who was 16 years old when the homicide occurred, was charged by direct filing in adult court.[26] At that time, former Welfare and Institutions Code section 707, subdivision (d)(1) allowed a prosecutor to bypass the juvenile court and directly file certain charges against a minor in adult court. (Stats. 2008, ch. 179, § 236, pp. 656–657.) Specifically, a prosecutor could file an accusatory pleading directly in adult court against a minor, like Ramirez, who was both 16 years of age or older and accused of committing certain specified offenses (including murder). (Former Welf. & Inst. Code, § 707, subds. (d)(1), (b)(1); Stats. 2008, ch. 179, § 236, pp. 654–657.)

The voters approved Proposition 57 at the November 8, 2016 general election; it took effect the next day. (Cal. Const., art. II, § 10, subd. (a).) Proposition 57 amended the Welfare and Institutions Code to mandate that any allegation of criminal conduct against any person under 18 years of age be commenced in juvenile court, regardless of the age of the juvenile or the severity of the offense. (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) Text of Proposed Laws, pp. 141–145.) As amended by Proposition 57, Welfare and Institutions Code section 707, subdivision (a)(1) now specifies that the sole mechanism by which a minor can be prosecuted in adult court is through a motion by a prosecutor to transfer the case from juvenile court to adult court.[27] In response to a motion to transfer, "the juvenile court shall decide whether the minor

---

[26] As we will be differentiating between courts of criminal jurisdiction and juvenile courts, we will refer to courts of criminal jurisdiction as adult courts.

[27] Specifically, Welfare and Institutions Code section 707, subdivision (a)(1) now provides: "In any case in which a minor is alleged to be a person described in Section 602 by reason of the violation, when he or she was 16 years of age or older, of any felony criminal statute, or of an offense listed in subdivision (b) when he or she was 14 or 15 years of age, the district attorney ... may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction."

should be transferred to a court of criminal jurisdiction," considering: the "degree of criminal sophistication exhibited by the minor"; whether "the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; the "minor's previous delinquent history"; the success "of previous attempts by the juvenile court to rehabilitate the minor"; and the "circumstances and gravity of the offense alleged in the petition to have been committed by the minor."[28] (§ 707, subd. (a)(2)(A)–(a)(2)(E).)

Proposition 57 also changed parole eligibility for both adults *and* juveniles tried in adult court. It added section 32 to article I of the California Constitution, which provides: "Any person convicted of a nonviolent felony offense and sentenced to state prison shall be eligible for parole consideration after completing the full term for his or her primary offense." (Cal. Const., art. I, § 32, subd. (a)(1).)

Proposition 57 contains uncodified sections, some of which are relevant to Ramirez's contentions. Section 2 states that the purpose and intent of the proposition was, among other things, to "[s]ave money by reducing wasteful spending on prisons"; "[s]top the revolving door of crime by emphasizing rehabilitation, especially for juveniles"; and "[r]equire a judge, not a prosecutor, to decide whether juveniles should be tried in adult court." (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) Text of Proposed Laws, p. 141.) Section 5 states that the act "shall be broadly construed to accomplish its purposes." (*Id.* at p. 145.) Section 9 states that the act "shall be liberally construed to effectuate its purposes." (*Id.* at p. 146.)

## B. TEXT AND HISTORY OF PROPOSITION 57 DO NOT SUPPORT RETROACTIVITY

Whether the voters intended Proposition 57 to apply retroactively is a question of law to which we apply our independent judgment. (*People v. Arroyo* (2016) 62 Cal.4th 589, 593 (*Arroyo*).) When interpreting a voter initiative, we apply the same

---

[28] Proposition 57 also amended Welfare and Institutions Code section 602, but those amendments are not relevant to this appeal. (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) Text of Proposed Laws, pp. 141–142.)

rules that govern statutory construction.  We first look to the language of the enactment, giving the words their ordinary meaning.  If the law is ambiguous, we refer to other sources of voter intent, including the arguments and analyses contained in the official ballot pamphlet.  (*Ibid.*)

"Whether a statute operates prospectively or retroactively is, at least in the first instance, a matter of legislative intent.  When the Legislature has not made its intent on the matter clear with respect to a particular statute, the Legislature's generally applicable declaration in section 3 provides the default rule:  'No part of [the Penal Code] is retroactive, unless expressly so declared.' "  (*People v. Brown* (2012) 54 Cal.4th 314, 319 (*Brown*).)  We are "cautious not to infer retroactive intent from vague phrases and broad, general language in statutes."  (*Ibid.*)

The text of Proposition 57 contains no express statement of intent regarding prospective or retroactive application.  Ramirez argues that retroactive intent can be inferred from broadly and liberally construing the initiative's stated purposes of saving money by reducing spending on prisons and requiring judges rather than prosecutors to decide whether juveniles should be tried in adult court.  (Citing Voter Information Guide, Gen. Elec. (Nov. 8, 2016) Text of Proposed Laws, p. 141.)  But even broadly construed, none of the stated purposes provide a reference to timing from which retroactive intent can be inferred.  In fact, there is arguably textual support for an inference of *prospective* intent.  One stated purpose is to require judges rather than prosecutors to decide "whether juveniles *should be* tried in adult court."  (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) Text of Proposed Laws, p. 141, italics added.)  That statement suggests an intent that Proposition 57 apply only to cases that have not already been tried.  At most, the text of Proposition 57 is ambiguous.

Because the text of the initiative is arguably ambiguous, we look to the ballot materials to determine whether they shed light on the voters' intent.  (*Arroyo*, *supra*, 62 Cal.4th at p. 593.)  Ramirez points to several statements from the argument in favor of

Proposition 57, which we separate into two groups because they appear to discuss different aspects of the initiative.

The first group includes three statements that Ramirez argues suggest the voters intended to apply Proposition 57 retroactively: "Prop. 57 focuses resources on keeping dangerous criminals behind bars, while rehabilitating juvenile and adult inmates and saving tens of millions of taxpayer dollars"; "Prop. 57 focuses our system on evidence-based rehabilitation for juveniles and adults because it is better for public safety than our current system"; and "Prop. 57 saves tens of millions of taxpayer dollars by reducing wasteful prison spending, breaks the cycle of crime by rehabilitating deserving juvenile and adult inmates, and keeps dangerous criminals behind bars." (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) argument in favor of Proposition 57 and rebuttal to argument against Proposition 57, pp. 58–59.) But those statements all reference both juveniles *and adults*, suggesting that they refer to the changes to parole Proposition 57 added to the California Constitution rather than to the Welfare and Institutions Code amendments.

The second group includes two passages that Ramirez points to as indications of voter intent, which appear to be related to the Welfare and Institutions Code amendments at issue here: "Requires judges instead of prosecutors to decide whether minors should be prosecuted as adults, emphasizing rehabilitation for minors in the juvenile system"; and "Evidence shows that the more inmates are rehabilitated, the less likely they are to re-offend. Further evidence shows that minors who remain under juvenile court supervision are less likely to commit new crimes. Prop. 57 focuses on evidence-based rehabilitation and allows a juvenile court judge to decide whether or not a minor should be prosecuted as an adult." (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) argument in favor of Proposition 57, p. 58.) Though those passages express voter intent to focus on rehabilitation, they are silent as to intent regarding retroactive application. And, like the statement of intent from Proposition 57 we already discussed, those

78

passages are susceptible of the same inference of prospective intent.  Both state that judges should decide whether minors "should be prosecuted," suggesting an intent for the law to apply only in the future.

In sum, we find that the voters did not make their intent clear regarding retroactive application in the text of Proposition 57 nor can we clearly discern their intent from the ballot pamphlet, meaning that we must follow section 3 and apply Proposition 57 prospectively unless the *Estrada* rule applies.  (*Brown*, *supra*, 54 Cal.4th at p. 319.)

## C.  THE *ESTRADA* RULE DOES NOT APPLY

Ramirez argues that retroactive application of Proposition 57 is compelled by the *Estrada* rule, which is a judicially-created exception to the general section 3 presumption that new statutes apply prospectively.

### 1.  The *Estrada* Rule

Even in the absence of voter intent to apply a proposition retroactively, the *Estrada* rule provides a "contextually specific qualification to the ordinary presumption" of prospective application.  (*Brown*, *supra*, 54 Cal.4th at p. 323, citing *Estrada*, *supra*, 63 Cal.2d 740.)  When the electorate (or Legislature) amends "a statute to reduce the punishment for a particular criminal offense," the *Estrada* rule provides an inference that the voters "intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date."  (*Brown*, at p. 323.)  That conclusion is based on the "premise that '[*a*] *legislative mitigation of the penalty for a particular crime* represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law.' "  (*Ibid.*, quoting *Estrada*, at p. 745, italics in *Brown*.)

*Brown* is instructive regarding application of the *Estrada* rule.  *Brown* involved a legislative amendment to section 4019 that temporarily increased the rate at which presentence custody credits were calculated.  (*Brown*, *supra*, 54 Cal.4th at pp. 317–319.)  Brown was sentenced to prison before the amendment but argued, based on the *Estrada*

79

rule, that the amendment should apply retroactively to him because his judgment was not yet final when the amendment became effective. (*Id.* at pp. 318–319, 323.) The *Brown* court decided the *Estrada* rule did not apply. It reasoned that unlike a legislative mitigation of the penalty for a particular crime, "a statute increasing the rate at which prisoners may earn credits for good behavior does not represent a judgment about the needs of the criminal law with respect to a particular criminal offense, and thus does not support an analogous inference of retroactive intent." (*Id.* at p. 325.) The court noted that section 4019 did not alter the penalty for a crime at all, it merely "addresses *future conduct* in a custodial setting by providing increased incentives for good behavior." (*Brown*, at p. 325, italics in original.)

The *Brown* court rejected an argument that the *Estrada* rule should "apply more broadly to any statute that reduces punishment in any manner." (*Brown*, *supra*, 54 Cal.4th at p. 325.) The court reasoned that such a broad application would expand the *Estrada* rule to such an extent as to swallow the general section 3 presumption of prospective application. (*Ibid.*) That expansion would run counter to the court's interpretation of the *Estrada* rule "not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." (*Brown*, at p. 324.) The court also explained that broadening the *Estrada* rule to apply to the section 4019 amendments would not "represent a logical extension of *Estrada's* reasoning." (*Brown*, at p. 325.) While acknowledging that "a convicted prisoner who is released a day early is punished a day less," the court noted that "the rule and logic of *Estrada* is specifically directed to a statute that represents ' "a legislative mitigation of the *penalty for a particular crime*" ' [citation] because such a law supports the inference that the Legislature would prefer to impose the new, shorter penalty rather than to ' "satisfy a desire for vengeance." ' " (*Ibid.*, italics in *Brown*.)

## 2. Analysis

Ramirez argues that the *Estrada* rule applies because Proposition 57 "specified that 'different treatment' as a juvenile was sufficient to meet ... 'the legitimate ends of the criminal law.' " (Quoting *Brown*, *supra*, 54 Cal.4th at p. 323.) The fundamental problem with Ramirez's argument is that—unlike every case he cites where a court found that the *Estrada* rule applied[29]—Proposition 57 does not mitigate the penalty for a particular crime. As the court emphasized in *Brown*: "We based this conclusion [that the *Estrada* rule requires retroactive application of statutes that reduce punishment for a particular offense] on the premise that '[a] *legislative mitigation of the penalty for a particular crime* represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law.' " (*Brown*, at p. 323, quoting *Estrada*, *supra*, 63 Cal.2d at p. 745, italics in *Brown*.)

Proposition 57 is distinguishable in two respects from the laws at issue in cases applying the *Estrada* rule. First, Proposition 57 does not expressly mitigate the penalty for any particular crime. Instead, it amends the Welfare and Institutions Code to create a presumption that all individuals under the age of 18 come within the jurisdiction of the

---

[29] Other than *Estrada* and *Brown*, Ramirez cites: *People v. Francis* (1969) 71 Cal.2d 66, 75–78 [defendant entitled to resentencing on controlled substances conviction where amendment made offense a wobbler instead of a straight felony]; *People v. Rossi* (1976) 18 Cal.3d 295, 298 [reversing oral copulation conviction after legislative amendment rendered the defendant's conduct non-criminal]; *People v. Babylon* (1985) 39 Cal.3d 719, 721–722 [reversing television piracy convictions where conduct no longer illegal under amendment enacted while appeal pending]; *People v. Nasalga* (1996) 12 Cal.4th 784, 787 [defendant entitled to shorter sentencing enhancement under legislative amendment increasing the minimum value of stolen property required for longer enhancement to apply]; *People v. Trippett* (1997) 56 Cal.App.4th 1532, 1536, 1548–1549 [reversing for limited retrial as to whether medicinal marijuana initiative provided valid defense to the defendant's marijuana possession conviction]; *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 783–786 [reversing for new trial to allow the defendant to argue that legislative amendments related to medicinal marijuana provided a valid defense to conspiracy to possess marijuana for sale charge].

juvenile court (Welf. & Inst. Code, § 602), and provides a procedural method for prosecutors to move to transfer a juvenile case to adult court (Welf. & Inst. Code, § 707, subd. (a)(1)). We acknowledge that the amendments may have the effect of reducing the punishment in some cases because, unlike adult court sentences, the longest that juvenile court jurisdiction generally extends is until the juvenile offender is 25 years old. (§ 607, subd. (b).) But, as the *Brown* court reasoned when reviewing the amendments to section 4019, the *Estrada* rule is not applicable to any amendment that *may* reduce a punishment. Instead, the *Estrada* rule is "specifically directed to a statute that represents ' "a legislative mitigation of the *penalty for a particular crime*." ' " (*Brown*, *supra*, 54 Cal.4th at p. 325, italics in *Brown*.)

Second, Proposition 57 provides no certainty that a minor will actually receive a mitigated penalty because juvenile courts have discretion under Proposition 57 to transfer juvenile cases to adult court. (Welf. & Inst. Code, § 707, subd. (a)(2).) If a case is transferred to adult court, the penalty for all offenses will be the same as they were before Proposition 57.

Given these distinctions, we find that applying the *Estrada* rule to Proposition 57 would expand that rule in such a manner as to risk swallowing the general section 3 presumption that legislation is intended to apply prospectively. (*Brown*, *supra*, 54 Cal.4th at pp. 324–325.)

*People v. Francis* (1969) 71 Cal.2d 66 (*Francis*), relied on by Ramirez, is distinguishable. Francis was convicted of committing a felony drug offense. While his case was pending on appeal, the statute prohibiting that drug offense was amended to change it from a straight felony to a wobbler that could be charged as a felony or a misdemeanor. The *Francis* court determined that the *Estrada* rule applied. (*Id*. at pp. 75–78.) The court reasoned that while the amendment did not guarantee Francis a lower sentence, making the crime punishable as a misdemeanor showed a legislative

82

intent that punishing the offense as a felony might be too severe in certain cases. (*Id.* at p. 76.)

*Francis* is distinguishable because it involved a legislative mitigation of the potential punishment for a specific crime. Where, as under Proposition 57, the potential benefit inures to a class of offenders based on their age rather than on the offenses they commit, the inference that voters deemed the entire Penal Code unduly severe when applied to minors is too attenuated to support application of the *Estrada* rule.[30]

Our conclusion that the *Estrada* rule does not apply is consistent with a recent decision interpreting Proposition 57. (*People v. Cervantes* (Mar. 9, 2017, A140464) __ Cal.App.5th __ (*Cervantes*).) Cervantes (who was 14 years old) was charged as an adult before Proposition 57 and convicted of several charges, including attempted murder and torture. (*Cervantes*, at p. __ [pp. 1, 6–7].) Proposition 57 passed while his case was pending on appeal. The Court of Appeal rejected Cervantes's argument that Proposition 57 should apply retroactively to him under the *Estrada* rule, reasoning that while Proposition 57 "will have a substantive impact on time in custody in some cases— sometimes a big impact—the transfer procedure required under [Welfare and Institutions Code] Section 707 does not resemble the clear-cut reduction in penalty involved in *Estrada*." (*Id.* at pp. __ [pp. 52–54].) The court observed that Proposition 57 "may or may not in some attenuated way affect punishment, but it is not a direct reduction in penalty as required for retroactivity under *Estrada*." (*Ibid.*)

---

[30] In concluding that the *Estrada* rule does not apply to Ramirez's case, we express no opinion on the possible applicability of Proposition 57 to cases where trial had not commenced before the initiative took effect. (See *People v. Superior Court (Lara)* (Mar. 13, 2017, E067296) __ Cal.App.5th __, __ [pp. 33–36] [finding juveniles charged in adult court by direct filing before Proposition 57 are entitled to fitness hearings before trials commence]; *Cervantes*, *supra*, __ Cal.App.5th at p. __ [pp. 54-69] [finding juvenile convicted in adult court after direct filing was entitled to a fitness hearing on remand before retrial of counts the Court of Appeal reversed].)

**D. NO EQUAL PROTECTION VIOLATION**

Ramirez argues that not applying Proposition 57 retroactively to his case would violate his state and federal constitutional rights to equal protection. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).)

### 1. Standard of Review

The concept of equal protection recognizes that individuals who are similarly situated should be treated equally, unless there is a justification for the differential treatment. (*Brown*, *supra*, 54 Cal.4th at p. 328.) The first step in an equal protection challenge is demonstrating that the state adopted a classification that affects two or more similarly situated groups in an unequal way. (*Ibid.*) That "initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.)

The second step is determining whether there is a sufficient justification for the unequal treatment. The level of justification needed is based on the right implicated. When the disparity implicates a suspect class or a fundamental right, strict scrutiny applies. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 836 (*Wilkinson*).) When no suspect class or fundamental right is involved, the challenger must demonstrate that the law is not rationally related to any legitimate government purpose. (*People v. Turnage* (2012) 55 Cal.4th 62, 74 (*Turnage*).) "In other words, the legislation survives constitutional scrutiny as long as there is ' "any reasonably conceivable state of facts that could provide a rational basis for the classification." ' " (*Ibid.*)

### 2. Ramirez is Similarly Situated with Juveniles Benefiting from Proposition 57

Ramirez is similarly situated with another class for purposes of his challenge to Proposition 57. The two classes are distinguished by whether trial had commenced

84

before Proposition 57's effective date.[31]  Ramirez falls within the class of individuals whose trials had already commenced.  He is similarly situated with a class of hypothetical individuals who are 16 or 17 years old and accused of crimes that could result in transfer to adult court, but whose trials had not commenced before Proposition 57 became effective.

### 3.  There is a Rational Basis for Ramirez's Differential Treatment

Having determined that Ramirez is similarly situated with another class of individuals, we must decide whether there is a justification for the differential treatment caused by prospective application of Proposition 57.  But first we must decide which standard of review applies:  strict scrutiny or rational basis.

Ramirez argues both that strict scrutiny applies because Proposition 57 implicates Ramirez's fundamental liberty interest (citing *People v. Olivas* (1976) 17 Cal.3d 236, 251 (*Olivas*)), and that the distinction cannot even survive rational basis review.

*Olivas* involved a challenge to a law that allowed adult misdemeanants who were under 21 years old to be tried in adult court and then remanded to the California Youth Authority.  (*Olivas*, *supra*, 17 Cal.3d at p. 239.)  The California Youth Authority could retain an individual until he or she turned 23 years old.  (*Id.* at p. 241.)  Olivas (who was 19 years old when he was arrested) was convicted of a misdemeanor that had a maximum sentence of six months, meaning that under the challenged law he faced a "potential period of confinement several times longer than the longest jail term which might have been imposed."  (*Id.* at pp. 239–242.)  Because his challenge implicated a fundamental

---

[31]  We acknowledge that when remanding the case for possible retrial or resentencing, the *Cervantes* court found that the distinguishing event for application of Proposition 57 was sentencing rather than commencement of trial.  (*Cervantes*, *supra*, __ Cal.App.5th __ [pp. 62–67] ["[B]eginning with the effective date of Prop[.] 57, a juvenile felon may not be 'sentenced in adult court' without a prior transfer hearing under Section 707, subdivision (a), if he or she so requests."].)  We explain in footnote 7, *post*, why defining the two classes based on sentencing rather than the commencement of trial would not change our equal protection analysis here.

85

liberty interest, the Supreme Court concluded that strict scrutiny applied. (*Id.* at pp. 247–251.)

Ramirez essentially argues that strict scrutiny applies here because he is potentially subject to a longer period of incarceration than those to whom Proposition 57 applies. Though *Olivas* could be interpreted to require strict scrutiny in any case involving penal statutes authorizing different sentences, "*Olivas* properly has not been read so broadly." (*Wilkinson*, *supra*, 33 Cal.4th at p. 837–838 [applying rational basis to equal protection challenge to two statutes prohibiting battery against custodial officers where it was possible that statute prohibiting battery without injury could be punished more severely than statute prohibiting battery with an injury]; accord *People v. Owens* (1997) 59 Cal.App.4th 798, 802 ["California courts have never accepted the general proposition that 'all criminal laws, because they may result in a defendant's incarceration, are perforce subject to strict judicial scrutiny.' "].) In a similar context, the Ninth Circuit concluded that the rational basis standard applied to a challenge brought by a defendant sentenced under Washington's indeterminate sentencing scheme who argued that he had been denied equal protection by not having that state's later-enacted determinate sentencing scheme applied to his case. (*Foster v. Washington State Bd. of Prison Terms and Parole* (9th Cir. 1989) 878 F.2d 1233, 1235.)

Ramirez's prosecution, conviction, and sentencing in adult court were all proper under the laws in place at the time of those events. Proposition 57 differentiates between people based on the timing of their prosecution rather than on any suspect classification. And Ramirez had no vested liberty interest " ' "in a specific term of imprisonment or in the designation a particular crime receives." ' " (*Turnage*, *supra*, 55 Cal.4th at p. 74.) We find that the rational basis standard applies.

Ramirez argues that the differential treatment he receives "bears no rational relationship to [Proposition] 57's 'objective.' " But the rational basis standard does not focus solely on a law's stated objective. It allows for " ' "any reasonably conceivable

state of facts that could provide a rational basis for the classification." ' " (*Turnage*, *supra*, 55 Cal.4th at p. 74, italics added.)  The voters could rationally conclude that applying Proposition 57 prospectively would serve the legitimate purpose of not overwhelming the juvenile courts with requests for fitness hearings by those who had already been convicted in adult court for crimes committed as juveniles.  (E.g., *Talley v. Municipal Court* (1978) 87 Cal.App.3d 109, 114–116 [finding no equal protection violation in prospective-only application of alcohol treatment program that bypassed license suspension because differential treatment rationally related to law's purpose of " 'prevent[ing] the courts and programs in each county from being overburdened at the commencement of the implementation of this article' "].)

The voters could also rationally conclude that applying Proposition 57 prospectively was rationally related to the legitimate government purpose of assuring that " 'penal laws will maintain their desired deterrent effect by carrying out the original prescribed punishment as written' " when the defendant committed the crime and was tried for that offense.  (*People v. Floyd* (2003) 31 Cal.4th 179, 188, 190–191 [rejecting equal protection challenge to prospective-only application of Proposition 36, the Substance Abuse and Crime Prevention Act of 2000, which guaranteed probation for individuals convicted of nonviolent possession offenses, subject to certain disqualifying circumstances].)  We acknowledge that the penal laws will not maintain their desired deterrent effect in *all* cases because Proposition 57 likely applies to juveniles who committed crimes before Proposition 57 but who were not prosecuted until after its effective date.  But a " 'classification is not arbitrary or irrational simply because there is an "imperfect fit between means and ends" ' [citations], or 'because it may be "to some extent both underinclusive and overinclusive." ' " (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 887.)

More fundamentally, the federal Constitution " 'does not forbid ... statutory changes to have a beginning and thus to discriminate between the rights of an earlier and

87

later time.' " (*Califano v. Webster* (1977) 430 U.S. 313, 314–316, 321 [rejecting equal protection challenge to an amendment to the Social Security Act that improved a retirement benefit calculation but applied only prospectively; plaintiff had argued retroactive application was required to prevent discrimination based on date of birth].)

Because there is a rational basis for prospective-only application of Proposition 57, Ramirez's equal protection challenge fails.[32]

### E. NO DUE PROCESS VIOLATION

Ramirez argues that not applying Proposition 57 retroactively to his case would violate his federal constitutional right to due process. He cites a single case to support that proposition, *Kent v. United States* (1966) 383 U.S. 541 (*Kent*).

*Kent* involved what the Supreme Court characterized as "a number of disturbing questions concerning the administration ... of the District of Columbia laws relating to juveniles." (*Kent*, *supra*, 383 U.S. at pp. 542–543.) When Kent was 16 years old, he was apprehended after his fingerprints were found in the apartment of a woman who had been raped. Police interrogated Kent for several hours, delivered him to a "Receiving Home for Children" for the night, and then interrogated him for several more hours the next day. (*Id.* at pp. 543–544.) Kent's mother retained counsel for Kent. His counsel filed motions requesting a hearing on the juvenile court's apparent intention to transfer Kent to

---

[32] Even assuming, consistent with *Cervantes*, that the two classes are distinguished by whether sentencing had occurred before Proposition 57's effective date (see *Cervantes*, *supra*, __ Cal.App.5th at p. __ [p. 67]), our equal protection analysis would not change. Applying Proposition 57 to juveniles who had been found guilty in adult court before Proposition 57 but who were not *sentenced* until after the initiative became effective would slightly increase the class of people who benefit from Proposition 57. But the voters could still rationally conclude that applying Proposition 57 only to that slightly larger class of juveniles would serve the legitimate government interest of preventing juvenile courts from being overwhelmed with requests for fitness hearings by those who had already been convicted *and sentenced* in adult court for crimes they committed as juveniles.

adult court and seeking access to Kent's juvenile court file. The juvenile court file contained a report that discussed the possibility of Kent having a mental illness. (*Id.* at pp. 544–546.) Without holding a hearing, the juvenile court summarily ordered Kent's case transferred to adult court, finding that "after 'full investigation, I do hereby waive' " the juvenile court's jurisdiction. (*Id.* at p. 546.) Kent was charged in adult court with residential burglary, robbery, and rape. He was found not guilty by reason of insanity of rape, but was found guilty of the remaining charges. (*Id.* at pp. 548, 550.)

The Supreme Court found that the juvenile court violated Kent's rights to due process and the effective assistance of counsel when it summarily transferred his case to adult court. (*Kent*, *supra*, 383 U.S. at pp. 557, 561–562.) The statute at issue stated that the juvenile judge "may, after full investigation, waive jurisdiction and order such child held for trial under the regular procedure of the court which would have jurisdiction of such offense if committed by an adult." (*Id.* at pp. 547–548.) The court found that "the statute read in the context of constitutional principles relating to due process and the assistance of counsel" required the juvenile court to provide a hearing, assistance of counsel (including providing the attorney access to juvenile court files), and a statement of reasons to support its decision. (*Id.* at pp. 557, 561–562.)

We find *Kent* readily distinguishable. *Kent* did not involve review of whether a law that had taken effect after a conviction should be applied retroactively. And the Supreme Court was careful to note that it was deciding the case based on its interpretation of the statute at issue there, read in the context of constitutional principles. (*Kent*, *supra*, 383 U.S. at pp. 557.) Ramirez does not argue that the trial court here violated any procedural statute in effect when he was prosecuted.

Over a century ago, the United States Supreme Court concluded that for purposes of due process, "the 14th Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time." (*Sperry & Hutchinson Co. v. Rhodes* (1911) 220 U.S. 502, 505 [denying due

process challenge to new law prohibiting use of person's picture in advertising without consent].)  Ramirez has failed to demonstrate any due process violation.

## IV.    DISPOSITION

The superior court is directed to prepare a new abstract of judgment for each defendant to note a 15-year minimum parole eligibility date based on Penal Code section 186.22, subdivision (b)(5), and to forward those abstracts to the Department of Corrections and Rehabilitation.   As so modified, the judgments are affirmed.

_____

Grover, J.

**WE CONCUR:**


_____

Manoukian, Acting P.J.


_____

Mihara, J.


*People v Mendoza et al*
H039705

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court, Case Nos.: 212506, C1114503 |
| Trial Judge: | Hon. Andrea Y. Bryan |
| Attorneys for Plaintiff/Respondent: The People | Xavier Becerra<br>  Attorney General of California<br>Gerald A. Engler<br>  Chief Assistant Attorney General<br>Jeffrey M. Laurence<br>  Senior Assistant Attorney General<br>Catherine A. Rivlin<br>  Supervising Deputy Attorney General<br>Moona Nandi<br>  Deputy Attorney General |
| Attorneys for Defendant/Appellant: Marcos Mendoza | James S. Thomson<br>  Attorney at Law<br><br>Under Appointment by the Court of Appeal Sixth District Appellate Project |
| Attorneys for Defendant/Appellant: Juan Ramirez | Kyle Gee<br>  Attorney at Law<br><br>Under Appointment by the Court of Appeal Sixth District Appellate Project |
| Attorneys for Defendant/Appellant: David Martell | David D. Martin<br>  Attorney at Law<br><br>Under Appointment by the Court of Appeal Sixth District Appellate Project |